IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,493

STATE OF KANSAS,
*Appellee*,

v.

LORENZO PULLIAM,
*Appellant.*

SYLLABUS BY THE COURT

1.

Conviction of involuntary manslaughter under an imperfect self-defense theory pursuant to K.S.A. 2017 Supp. 21-5405(a)(4) does not require proof of a reckless or unintentional killing.

2.

On the evidence presented in this case, it was error for the district judge to omit a lesser included crime instruction on involuntary manslaughter under K.S.A. 2017 Supp. 21-5405(a)(4), but the omission does not require reversal under the clearly erroneous standard.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 10, 2016. Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed November 21, 2018. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jennifer S. Tatum*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  This is defendant Lorenzo Pulliam's direct appeal of his convictions for attempted voluntary manslaughter of Zachary Eisdorfer, second-degree murder of Zachary Burton, and criminal possession of a firearm.

Before the Court of Appeals, Pulliam raised several issues, including a claim that the jury should have been instructed on a theory of imperfect self-defense involuntary manslaughter as a lesser included crime for the charge of second-degree murder of Burton. The Court of Appeals held that such an instruction was not factually appropriate and rejected Pulliam's claim. The court also rejected Pulliam's other claims of error and affirmed his convictions and sentence. See *State v. Pulliam*, No. 113,493, 2016 WL 6651243, at *11 (Kan. App. 2016) (unpublished opinion).

Pulliam filed a petition for review of five issues by this court. We granted review of only one:  Did the district judge err by failing to instruct the jury on imperfect self-defense involuntary manslaughter? We hold that the district court erred but that the error does not require reversal under the clear error standard. We affirm the Court of Appeals' decision affirming the judgment of the district court, although we differ from the Court of Appeals panel on rationale.

FACTUAL AND PROCEDURAL BACKGROUND

In its opinion, the Court of Appeals panel succinctly laid out the basic facts surrounding the shooting of Eisdorfer and Burton.

"Lorenzo Pulliam served in the U.S. Army and deployed four times, including assignments to Kuwait and Iraq where he was exposed to combat deaths. During his final deployment, he learned his wife had died in an accident. He later was transferred to Fort Leavenworth, where he was evaluated and diagnosed with post-traumatic stress disorder (PTSD). Following discharge from the Army, Pulliam returned to Wyandotte County. He resumed his friendship with Zach Eisdorfer, whom he had known since childhood.

"On August 22, 2012, Pulliam received a call from Eisdorfer, asking him to come by Eisdorfer's house since he hadn't seen him for a few days. When Pulliam arrived, Kimberly Hetzler, also a childhood friend, was there with Eisdorfer, and the three of them talked and watched television. At some point Pulliam and Hetzler left Eisdorfer in the house and went outside.

"In the early morning hours of August 23, a man unknown to Pulliam and Hetzler walked up to Eisdorfer's house carrying a gas can. The man was Zach Burton. According to Hetzler, Pulliam and Burton exchanged a greeting, and Burton went inside to Eisdorfer's room. Since she didn't know the man, Hetzler said she went in to get her purse and saw Burton buying drugs from Eisdorfer. After she went back outside, Pulliam went in and, within 30 seconds to a minute of that entry, Hetzler . . . heard five shots. Hetzler ran into the home and saw Burton on the floor with Eisdorfer standing over him, and Pulliam was not there.

"Officer Keith Faulkner testified at trial that he responded to a call at Eisdorfer's house around 4 a.m. on August 23, 2012, where he encountered Eisdorfer outside of the home, bleeding from a wound and saying that Pulliam shot him. When he entered the house, Faulkner found Burton, deceased, lying face down on the floor. Officer Charles Stanturf was also called to the scene and spoke with Eisdorfer who told him his friend,

3

Pulliam, showed up and without warning pulled a revolver and started shooting at him. Eisdorfer was wearing an empty holster and told Stanturf there was a gun on the floor in the dining room.

"Pulliam had fled the scene and after several intervening stops turned himself in to the police, admitting that he had shot Eisdorfer and Burton." *Pulliam*, 2016 WL 6651243, at *1-2.

As a result of the shootings, the State charged Pulliam with attempted premeditated first-degree murder of Eisdorfer, intentional second-degree murder of Burton, and criminal possession of a firearm.

It was undisputed at trial that Pulliam had shot Eisdorfer and Burton. But evidence of three different versions of events was introduced, each version contradicting the two others.

Eisdorfer testified that Pulliam came over to his house on the evening of August 22 to hang out with him and Hetzler. After Eisdorfer received a call, Pulliam and Hetzler went outside, where they stayed for the next several hours.

At some point, Burton's girlfriend called Eisdorfer to tell him Burton was on the way to pay Eisdorfer some money and "[p]robably to get drugs." When Burton arrived, he came in the back door of the house and started talking with Eisdorfer. Pulliam was still outside with Hetzler at the time. According to Eisdorfer, shortly after Burton arrived, Pulliam kicked the door open and started shooting. Eisdorfer believed he "heard three gunshots in a row." After hearing the shots, Eisdorfer looked down and saw blood all over his shirt.

4

During the shooting, Eisdorfer picked up his own gun, which had been "sitting kind of by [him]." Eisdorfer believed he might have "squeeze[d] off one shot" at Pulliam while Pulliam was still shooting from the doorway but thought he probably had not because he "didn't have one in the chamber." After Eisdorfer tried to fire, he turned and ran to the other end of the house to get away from Pulliam. Eisdorfer made it to a bathroom and saw that he was bleeding from his chest. When he then went out to check on Burton, he saw him lying face down on the floor. By that time, Pulliam was gone.

A panicked Eisdorfer told his mother, who was also at the house, to call 911. Eisdorfer walked out to the street, where he passed out while waiting for an ambulance to arrive.

The second version of events came into evidence through an audio recording of Pulliam's post-arrest statement to Detective Willie Jenkins.

Pulliam told Jenkins that he had heard Eisdorfer talking to Burton's girlfriend on the phone and was "skeptical" when Burton showed up instead of the girlfriend because Eisdorfer had not mentioned it. According to Pulliam, he was outside when Burton arrived, and he remained outside for about 15 minutes. Pulliam briefly went inside before going back outside.

Pulliam eventually came back inside and sat next to Eisdorfer. When he did, he asked whether Burton had walked to the house. Burton responded, "Checkmate," which Pulliam interpreted as "game over." Pulliam asked Burton the question again, to which Burton again responded, "Checkmate." Almost simultaneously, there was an explosion depicted on the television. Then the shooting started. According to Pulliam, he and Eisdorfer were both shooting.

5

Pulliam admitted that he had shot Burton and that he had fired three or four shots. He also thought he had probably hit Eisdorfer but was not sure where he had hit him.

After the initial shots, Pulliam tried to leave by running through the kitchen of the house. He believed Eisdorfer was coming at him and felt he had to get out of the house to avoid being killed.

Pulliam reiterated throughout the statement to Jenkins that he thought he was going to die and that, when Burton said, "Checkmate," he thought, "[T]hat was it." He also said he felt like his life was in jeopardy each time he went to Eisdorfer's house. The phone conversation he overheard had made him feel like this particular visit "was a setup" from the beginning.

In response to Jenkins' question about whether Pulliam intended to shoot Burton after Burton said, "Checkmate," Pulliam responded:  "I felt like, as an intent . . . I ain't have no . . . I had no [inaudible]. And . . . [h]e was going . . . he was going to kill me." He then conceded that, to his knowledge, Burton had no gun and had not made a move toward him.

Pulliam's trial testimony outlined the third version of events.

Pulliam testified that he got a call from Eisdorfer on the night of August 22, asking him to come over and hang out. It had been a couple of weeks since Pulliam had seen Eisdorfer, because, Pulliam said, Pulliam was trying to change his life and get away from drugs.

When Pulliam arrived, Eisdorfer and Hetzler were there and the group smoked methamphetamine. At one point, Pulliam got up to go to the bathroom, and, as he was

6

walking through the kitchen, he heard Eisdorfer cock his pistol. Pulliam then went outside and talked with Hetzler for several hours.

Pulliam eventually came back into the house and heard Eisdorfer on the phone, probably setting up a drug deal. Pulliam testified that such conversations made him nervous, because it meant that people Pulliam did not know would be showing up at Eisdorfer's house soon.

Pulliam went back outside. About 45 minutes later, Burton walked up, carrying a gas can. Pulliam was uncomfortable because it was odd that someone would be carrying a gas can down the street. Burton went into the house. Several minutes later Pulliam followed.

After Pulliam walked in and sat down, he asked Burton how he had gotten there. Burton responded, "'Checkmate.'" Pulliam interpreted the statement as, "It's game over, or my life was in jeopardy," because "there's plenty of times [Eisdorfer] called people over, said 'I think you would be a good match for him,' or you know, certain situations that [Eisdorfer] put me in made me feel like that."

After Burton's first "Checkmate" comment, Pulliam asked the same question and Burton again responded, "'Checkmate.'" Pulliam looked at Eisdorfer and saw that he was wearing his gun holster. Pulliam got up and told Eisdorfer, "'I'm about to get out of here. I'm about to go.'" Pulliam "felt in an odd position." He testified, "I felt like, you know, I really needed to leave. I felt my heart drop. I felt cold."

Pulliam shook Eisdorfer's hand. Then, "When I turned around, I heard the cocking of [Eisdorfer's] pistol"—a sound Pulliam was familiar with from his time in the Army. Pulliam pulled out his gun and shot Eisdorfer because he believed that, if he did not,

7

Eisdorfer would shoot him in the back. Burton got up and came toward Pulliam. Pulliam shot Burton because he thought Burton was trying to kill him.

Pulliam tried to leave through the kitchen, but the door was blocked. Eisdorfer was coming after Pulliam through a curtain hanging between rooms, and Pulliam knocked Eisdorfer's gun from his hands. As Pulliam ran out of the house, he fired another shot at Eisdorfer.

Pulliam testified that his story at trial varied from his statement to Jenkins because he had been scared to tell the detective the full story.

After Pulliam testified, the defense called Dr. William Logan, a psychiatrist, to testify about Pulliam's Post-traumatic Stress Disorder. Logan described Pulliam's state at the time of the shooting as a

> "general state of hyperalertness; . . . he was, in common parlance, paranoid; . . . he was extremely suspicious; . . . he was quite apprehensive about events leading up to this. . . . [H]e also exhibited an exaggerated startle response. . . . The reaction to the explosion on the TV, which is characteristic of PTSD, and also hearing a gun cock would have kind of put him into overdrive, if you will."

Logan concluded that Pulliam's actions at the time of the shooting were consistent with "someone suffering from [PTSD]."

The State called Dr. David George Hough, a psychologist. Hough was concerned by Pulliam's lack of PTSD history between his military discharge and the crimes. He said Pulliam's post-shooting behavior was "a very erratic kind of behavior that in my experience is often observed post-defense. It's a kind of anxiety. It's a kind of desperate effort to get away." Hough viewed Pulliam's actions as intentional behavior, but he

8

conceded on cross-examination that "'Mr. Pulliam's behavior at the time of the commission of the shootings . . . could be consistent with an acute paranoid state of mind that could have been part of a PTSD condition.'"

At the jury instruction conference, the State argued that it would not be appropriate to instruct on self-defense. The district judge disagreed and included a self-defense instruction. The instruction said:

> "Defendant claims his use of force was permitted as self-defense.

> "Defendant is permitted to use physical force against another person, including using a weapon[,] when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

> "Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

> "When use of force is permitted as self-defense, there is no requirement to retreat."

The parties then briefly discussed inclusion of a voluntary manslaughter instruction as a lesser included offense of second-degree murder of Burton. The State and the judge agreed to remove a "sudden quarrel" version of voluntary manslaughter from the instruction, limiting its definition to the killing of a human being upon an unreasonable but honest belief that circumstances existed that justified use of deadly

9

force. The discussion then turned to the necessity of a still lesser included offense instruction for involuntary manslaughter.

> "[The State]: And then I would argue that—you've included involuntary manslaughter, and I would argue that that's not appropriate in this case. I don't think we've had any testimony that his actions were done in a reckless manner. Even per his own testimony, he's saying he intentionally did the shootings."

Pulliam's counsel responded, "Judge, I think you're supposed to instruct on all of them. I would agree with [the prosecutor] that involuntary is probably a stretch." The district judge removed the instruction because there had been no evidence of reckless behavior. Neither the parties nor the district judge appears to have considered the possibility of instructing on imperfect self-defense involuntary manslaughter under a theory that Pulliam committed "a lawful act in an unlawful manner." See K.S.A. 2017 Supp. 21-5405(a)(4).

The jury found Pulliam guilty of the lesser included offense of attempted voluntary manslaughter of Eisdorfer, the charged second-degree murder of Burton, and criminal possession of a firearm.

On appeal to the Court of Appeals, the panel rejected Pulliam's argument that it was clear error not to instruct the jury on the lesser included crime of involuntary manslaughter of Burton. Pulliam had argued that "imperfect self-defense can apply where a person 'unintentionally killed a human being by committing the lawful [act] of self-defense in an unlawful manner through the use of excessive force.'" Pulliam reasoned that he "did not say he intended to kill Burton"; thus a jury could have found him guilty of involuntary manslaughter.

10

Relying on *State v. Houston*, 289 Kan. 252, 276, 213 P.3d 728 (2009), the panel concluded that involuntary manslaughter required that a killing be unintentional and that there was no evidence to support an unintentional killing of Burton by Pulliam. *Pulliam*, 2016 WL 6651243, at *7. The panel said: "[T]he fundamental difference between voluntary and involuntary manslaughter [is] implicit in the titles—voluntary manslaughter is an intentional killing and involuntary manslaughter is an unintentional killing." 2016 WL 6651243, at *6.

In his petition for review, Pulliam argued that *Houston* was no longer good law, because the involuntary manslaughter statute had been amended after *Houston* was decided.

DISCUSSION

This court follows four steps when reviewing challenges to jury instructions:

"""(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012)." [Citation omitted.]

"""Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. [Citation omitted.] And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. [Citations omitted.]"

11

"'We examine "jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury." [Citation omitted.]' *Hilt*, 299 Kan. at 184-85." *State v. Mattox*, 305 Kan. 1015, 1020, 390 P.3d 514 (2017).

Resolution of the issue in this case also requires the court to interpret the relevant statutes. We exercise unlimited review on questions of statutory interpretation and construction. *State v. Castleberry*, 301 Kan. 170, 175, 339 P.3d 895 (2014) (statutory interpretation raises question of law reviewable de novo on appeal).

The first step in our analytical progression is to determine whether the issue is reviewable.

The parties agree, and the record reflects, that Pulliam did not request an instruction on involuntary manslaughter based on a theory that he killed Burton by committing a "lawful act in an unlawful manner." The only district court discussion of an involuntary manslaughter instruction focused on whether evidence existed to support a verdict that Pulliam acted recklessly. Because there was no objection to the omission of the "lawful act in an unlawful manner" involuntary manslaughter instruction, K.S.A. 2017 Supp. 22-3414(3) governs. The statute permits review of Pulliam's claim on appeal but allows reversal of his second-degree murder conviction only if the instructional error qualifies as clear.

The second step in our analysis is determining whether the instruction was legally appropriate. An instruction on a lesser included crime is legally appropriate. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). And a lesser included crime includes a "lesser degree of the same crime." K.S.A. 2017 Supp. 21-5109(b)(1). This court has

recognized five degrees of homicide. In descending magnitude, they are capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. *State v. Carter*, 305 Kan. 139, 161, 380 P.3d 189 (2016) (citing *State v. Cheever*, 295 Kan. 229, 258-59, 284 P.3d 1007 [2012]). The involuntary manslaughter instruction therefore would have been legally appropriate as a lesser degree of homicide when compared to the charged second-degree murder.

The third step in our analytical progression is determination of whether the instruction was factually appropriate. The involuntary manslaughter statute applicable at the time of Pulliam's crime was K.S.A. 2017 Supp. 21-5405, which reads:

"(a) Involuntary manslaughter is the killing of a human being committed:

(1) Recklessly;

(2) in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined in K.S.A. 2017 Supp. 21-5402, and amendments thereto, that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566 and subsection (a) of 8-1568, and amendments thereto, but excluding the acts described in K.S.A. 8-1567, and amendments thereto;

(3) in the commission of, or attempt to commit, or flight from an act described in K.S.A. 8-1567, and amendments thereto; or

(4) during the commission of a lawful act in an unlawful manner.

"(b) Involuntary manslaughter as defined in:

13

(1) Subsection (a)(1), (a)(2) or (a)(4) is a severity level 5, person felony; and

(2) subsection (a)(3) is a severity level 4, person felony."

The subsection with which we are concerned here, subsection (a)(4), defines involuntary manslaughter as "the killing of a human being committed . . . during the commission of a lawful act in an unlawful manner." This court has recognized that such a killing is one type of imperfect self-defense, a "lawful exercise of self-defense, but with excessive force." See *State v. McCullough*, 293 Kan. 970, 976, 270 P.3d 1142 (2012); see also *State v. Gregory*, 218 Kan. 180, 542 P.2d 1051 (1975).

The Court of Appeals invoked this court's *Houston* decision to reject Pulliam's claim. See 289 Kan. 252. But our decision that defendant Michael D. Houston, Sr., was not entitled to an involuntary manslaughter instruction was based on an earlier version of the crime-defining statute. It explicitly required imperfect self-defense involuntary manslaughter to be an unintentional killing, defining it as "the unintentional killing of a human being . . . during the commission of a lawful act in an unlawful manner." K.S.A. 21-3404(c). On the facts of that case, we concluded that "no rational jury in this state could have found that Houston did not intend to kill Johnson. Because involuntary manslaughter requires an unintentional killing, the evidence would not reasonably justify a conviction of that crime." 289 Kan. at 275.

The problem with the Court of Appeals' decision in this case is that it relied on outdated law. The language of the imperfect self-defense involuntary manslaughter statute no longer explicitly requires a killing to be "unintentional." See K.S.A. 2017 Supp. 21-5405. "Ordinarily, courts presume the legislature intends to make a substantive change when it revises an existing law, but this presumption's strength, weakness, or validity changes according to the circumstances." *Brennan v. Kansas Insurance Guaranty*

14

*Ass'n*, 293 Kan. 446, 458, 264 P.3d 102 (2011). The amended involuntary manslaughter statute and a new culpable mental states statute, K.S.A. 2017 Supp. 21-5202, govern this case.

The most fundamental rule of statutory interpretation is that legislative intent governs if it can be ascertained. *State v. Davey*, 306 Kan. 814, 820, 397 P.3d 1190 (2017). "[J]udicial interpretation must be reasonable and sensible to effectuate the legislative design and the true intent of the law." *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016).

> "An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent." *State v. Keel,* 302 Kan. 560, Syl. ¶ 6, 357 P.3d 251 (2015).

Until the 2011 recodification of its criminal code, Kansas did not define culpable mental states. Although pre-recodification statutes defining crimes referenced various mental states, see, e.g., K.S.A. 21-3761(a)(2) ("maliciously or wantonly"), the code employed a general requirement of "criminal intent." K.S.A. 21-3201. The code also contained definitions of intentional and reckless conduct. See K.S.A. 21-3201(b), (c).

As a part of recodification, the Legislature defined "intentionally," "knowingly," and "recklessly," identifying each as a possible "culpable mental state." See K.S.A. 2017 Supp. 21-5202(h)-(j); see also *State v. McLinn*, 307 Kan. 307, 318-22, 409 P.3d 1 (2018).

15

The Legislature also provided guidance on how to determine the culpable mental state required by a particular statute defining a crime. See K.S.A. 2017 Supp. 21-5202(d)-(g).

"(a) Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code. A culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'

"(b) Culpable mental states are classified according to relative degrees, from highest to lowest, as follows:

(1) Intentionally;

(2) knowingly;

(3) recklessly.

"(c) Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally.

"(d) If the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element.

"(e) If the definition of a crime does not prescribe a culpable mental state, but one is nevertheless required under subsection (d), 'intent,' 'knowledge' or 'recklessness' suffices to establish criminal responsibility.

"(f) If the definition of a crime prescribes a culpable mental state that is sufficient for the commission of a crime, without distinguishing among the material elements

16

thereof, such provision shall apply to all the material elements of the crime, unless a contrary purpose plainly appears.

"(g) If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided.

"(h) A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are specific intent crimes. A crime may provide that any other culpability requirement is a specific intent.

"(i) A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes.

"(j) A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2017 Supp. 21-5202.

Under K.S.A. 2017 Supp. 21-5202(a), "a culpable mental state is an essential element of every crime" and a "culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'"

17

The identified culpable mental states are classified by relative degree, from highest to lowest: "intentionally" being the most serious, followed by "knowingly" and then "recklessly." K.S.A. 2017 Supp. 21-5202(b).

Proof of a higher degree of culpability than that necessary constitutes proof of the necessary degree of culpability. "If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally." K.S.A. 2017 Supp. 21-5202(c).

Even if a statutory definition of a crime does not prescribe a culpable mental state, one is required, "unless the definition plainly dispenses with any mental element." K.S.A. 2017 Supp. 21-5202(d). If a culpable mental state is required but one is not included in the crime's definition, then proof of "intent," "knowledge," or "recklessness" is sufficient to establish criminal responsibility. K.S.A. 2017 Supp. 21-5202(f). If, however, a crime is "a felony and the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described," a person may be guilty of the crime without having a culpable mental state. K.S.A. 2017 Supp. 21-5203(b).

Whether a culpable mental state applies to each element of a crime or only to a specific element is governed by K.S.A. 2017 Supp. 21-5202(f) and (g). If a statute defining a crime prescribes a culpable mental state "without distinguishing among the material elements thereof," the mental state applies to all "material elements" of the crime "unless a contrary purpose plainly appears." K.S.A. 2017 Supp. 21-5202(f). If, on the other hand, a crime's definition prescribes a culpable mental state only for a particular element, "the prescribed culpable mental state shall be required only as to [a] specified element"; a culpable mental state is not required for any other element "unless otherwise provided." K.S.A. 2017 Supp. 21-5202(g).

18

K.S.A. 2017 Supp. 21-5405, the statute defining involuntary manslaughter, sets out four alternative means for committing the crime. See *State v. Brown*, 295 Kan. 181, 193, 284 P.3d 977 (2012) (legislative intent, as expressed through statute, determines whether alternative means exist). Each requires the "killing of a human being." K.S.A. 2017 Supp. 21-5405.

The first alternative means simply adds a culpable mental state of "recklessly." K.S.A. 2017 Supp. 21-5405(a)(1). The second and third alternative means set out in K.S.A. 2017 Supp. 21-5405(a)(2) and (a)(3) are manslaughter equivalents that mimic the provision for felony murder, which covers a killing done during the commission of, attempt to commit, or flight from any inherently dangerous felonies, see K.S.A. 2017 Supp. 21-5402(a)(2); they apply to noninherently dangerous felonies and misdemeanors that have been "enacted for the protection of human life or safety." These two subsections do not specify a required culpable mental state. Apparently any required culpable mental state would have to be an element of the underlying offense. Cf. *State v. Robinson*, 256 Kan. 133, 137, 883 P.2d 764 (1994) ("Felony murder in Kansas depends upon transferred intent to supply the malice, deliberation, and premeditation elements.").

The final alternative means, the one at issue here, requires a killing to occur "during the commission of a lawful act in an unlawful manner." K.S.A. 2017 Supp. 21-5405(a)(4). This defining subsection also does not specify a required culpable mental state.

Although K.S.A. 2017 Supp. 21-5202(d) and (e) have potential to inform the culpable-mental-state analysis "[i]f the definition of a crime does not prescribe a culpable mental state," that potential is unrealized in this case. The "crime" before us is involuntary manslaughter, rather than any of its individual and distinct alternative means.

19

And the entire involuntary manslaughter statute is *not* silent on culpable mental state. The first alternative means explicitly requires a defendant to kill "recklessly." See K.S.A. 2017 Supp. 21-5405(a)(1). We therefore cannot rely on subsections (d) and (e) of K.S.A. 2017 Supp. 21-5202 to guide us on the mental state required for the imperfect self-defense means of involuntary manslaughter under K.S.A. 2017 Supp. 21-5405(a)(4).

Likewise, K.S.A. 2017 Supp. 21-5202(f) is not helpful in this case. It generally applies to a crime that does not distinguish the applicable culpable mental states applicable to its material elements, and the involuntary manslaughter statute appears to make such a distinction. The universal element of a "killing of a human being" is structurally separated from the alternative elements of the crime. And, again, one of those alternatives does state expressly that the killing must be committed recklessly. K.S.A. 2017 Supp. 21-5405(a)(1). It is obvious that the Legislature knew how to specify a culpable mental state for an alternative means in the involuntary manslaughter statute if it intended to do so.

This leaves us with only subsection (g) of the culpable mental states statute, K.S.A. 2017 Supp. 21-5202. It applies when "the definition of a crime prescribes a culpable mental state with regard to a particular element." But, again, the involuntary manslaughter statute prescribes a culpable mental state for a particular element only under subsection (a)(1), where it expressly attaches "recklessly" to the universal element of a "killing." No culpable mental state is attached to the underlying "killing" required for the alternative means at issue here; subsection (a)(4)'s imperfect self-defense involuntary manslaughter is committed when the killing results from commission of a "lawful act in an unlawful manner."

This tandem, harmonizing reading of the plain language of the involuntary manslaughter statute and the plain language of the culpable mental states statute compels

20

us to conclude that *they* do not require a specific culpable mental state to be proved in order to convict a defendant under an imperfect self-defense theory. Of course, when the alleged lawful act that is a component of the crime under K.S.A. 2017 Supp. 21-5405(a)(4) is self-defense, a jury instruction on involuntary manslaughter must be supported by evidence from which a jury could find that the defendant possessed a reasonable and honest belief that physical force was required. This reasonable and honest belief might fairly be characterized as a required mental state, but it is not listed as a culpable mental state in K.S.A. 2017 Supp. 21-5202.

Be that as it may, Pulliam's testimony here, although it strayed from his original statement to the detective, included that he heard a gun cock and thought that he was about to be shot in the back. This testimony supported the district judge's decision to instruct the jury on self-defense. It also supported the instruction given on the imperfect self-defense form of the lesser included offense of voluntary manslaughter.

This testimony also made a lesser included offense instruction on the imperfect self-defense form of involuntary manslaughter factually appropriate, and it was error for the district judge not to give it. Had the jury believed one version of Pulliam's account, it could have convicted him of killing Burton in the commission of the lawful act of self-defense in the unlawful manner of using excessive force. The current involuntary manslaughter and culpable mental state statutes did not require admitted evidence that the killing of Burton was reckless (as the district judge apparently believed) or unintentional (as the Court of Appeals panel believed) before a K.S.A. 2017 Supp. 21-5405(a)(4) instruction would be given.

The final step in our analytical progression on appellate claims of instructional error asks whether any such error is reversible. As noted above, because Pulliam did not request the instruction at issue, his conviction of second-degree murder for Burton's

21

killing can be overturned only if omission of the imperfect self-defense involuntary manslaughter instruction qualifies as clearly erroneous. Under the clear error standard, an error is reversible error if the reviewing court is firmly "'convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.'" *State v. McClelland*, 301 Kan. 815, 828, 347 P.3d 211 (2015) (quoting *State v. Cruz,* 297 Kan. 1048, 1066-67, 307 P.3d 199 [2013]).

The State argues that the "skip rule" precludes any error from being reversible because the jury rejected voluntary manslaughter, an intermediate result. But we need not mechanically apply the skip rule in this case. See *State v. Williams*, 303 Kan. 585, 363 P.3d 1101 (2016) (skip rule not amenable to mechanical application, should be viewed as providing route to harmlessness when elements of crime of conviction, as compared to rejected lesser included crime, necessarily show jury would have rejected still lesser included crime).

Regardless of what the members of Pulliam's jury may have thought or not thought about the evidentiary support for imperfect self-defense voluntary manslaughter—a killing committed upon an unreasonable but honest belief that circumstances justifying the use of deadly physical force exist—we know that they did not accept the idea that the killing of Burton was excused entirely by self-defense. The jury convicted Pulliam of second-degree murder rather than acquitting him. We also know that the evidence of exactly what occurred was conflicting, even if only Pulliam's versions of events are considered. Clear error sets a high burden for a defendant in Pulliam's position. We cannot say we are firmly convinced that the jury would have reached a different verdict had it been instructed on imperfect self-defense involuntary manslaughter as a lesser included offense of the second-degree murder of Burton.

22

CONCLUSION

We affirm the Court of Appeals' ultimate decision affirming the district court's judgment. The district judge's omission of a lesser included offense instruction on involuntary manslaughter was not clearly erroneous.