NOT DESIGNATED FOR PUBLICATION

No. 126,031

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID CHANDLER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Submitted without oral argument. Opinion filed May 31, 2024. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., MALONE and WARNER, JJ.


PER CURIAM:  A jury convicted David G. Chandler of intentional second-degree murder for his role in the violent and fatal beating inflicted upon Blake Barnes outside a homeless encampment. Chandler asks this court to reverse his conviction, raising claims related to lesser included offenses and challenging the denial of a motion for new trial based on juror misconduct. Based on a thorough review of the issues presented, we affirm Chandler's conviction.

FACTUAL AND PROCEDURAL HISTORY

The facts as presented in Chandler's jury trial follow.

*Witnesses observe the beating of the victim and identify Chandler as one of the participants.*

Blake Gaines was driving north on Seneca Street in Wichita with his aunt, Jacque Marr, in the passenger seat. As they drove by the Seneca Street bridge, both Gaines and Marr saw two people swinging objects that looked like metal pipes in a downward direction toward a man lying motionless on the ground. After turning the vehicle around and pulling into a nearby parking lot, Gaines saw one of the men ride away on a bicycle, while the other man—a white male with a beard and white hair, wearing a leather jacket and leather pants—walked below the bridge carrying the object he had been using to hit the man on the ground.

Gaines called 911 and went to check on the injured man on the bridge. He immediately recognized him as Blake Barnes, whom he had known for over ten years. Barnes was unresponsive and appeared to be having a seizure. The back of Barnes' head was "busted" and "looked like some of his brains were out of the back of his head." At some point, Gaines saw the bearded man emerge from under the bridge and begin walking north away from the scene. Once police arrived, Gaines pointed out the man—who he and Marr identified at trial as Chandler—as one of the assailants. Officer Austin Smith located and questioned Chandler, who denied any knowledge of the incident on the bridge. Based on the information Officer Smith had received from Gaines, Smith took Chandler into custody.

After he was taken into custody, officers observed blood on Chandler's clothing and shoes that was later tested and confirmed as consistent with Barnes' DNA profile.

Officers also retrieved a walking stick from Chandler's tent, which contained blood consistent with Barnes' DNA profile. An autopsy confirmed that Barnes' cause of death was blunt force trauma to the head, because of multiple skull fractures and other head and brain injuries. Barnes also had abrasions and lacerations on his back, shoulders, hands, arms, and legs.

*Chandler denies involvement, then admits he participated in the beating.*

During a custodial interview—which was recorded and later published for the jury—Chandler gave differing accounts of his knowledge as to what happened. Chandler explained that he lived in a tent under the bridge in an encampment with other individuals experiencing homelessness, and that he arrived back at the camp between 6:30 p.m. and 7 p.m. after having dinner at a soup kitchen. Chandler first denied having any knowledge of or involvement in the beating. As the interview progressed, Chandler continued denying any involvement and repeatedly stated he was not one of the men identified by witnesses because he did not go up onto the bridge that evening.

In a later part of the interview, Chandler continued denying any involvement but stated that someone at the encampment told him there was somebody in his tent when he returned that evening. Chandler also said he "did not confront the guy" and denied seeing anybody in his tent. After the detective explained that witnesses had seen Chandler and "Abel"—later identified as Abel Molina—beating a man on the bridge and described the other evidence they had received, Chandler stated that the fight was already happening when he arrived. Chandler added that the man, who he did not know, had once stolen a sleeping bag and a spare tent from Chandler. Chandler denied participating in the beating but stated the beating occurred because the man was stealing out of Chandler's tent. Chandler said it got "way out of hand." He also revealed that the man had stolen Chandler's "staff" and was using it to fight Chandler's friends. Chandler then admitted he was up on the bridge and saw Molina "damn near killing the guy."

3

At that point, the detective revealed to Chandler that the man, Blake, had died as the result of his injuries. After a lengthy silence, Chandler again said he saw Molina hit Barnes repeatedly with a stick. Chandler also said there were more than two people up on the bridge, including himself, Molina, and another individual named "Red." Chandler said Molina was "beating the crap out of this guy," but Chandler only hit Barnes four to five times in the stomach and arms "with the stick that he stole from me . . . after Abel was done beating on him [and] I took the stick away from the guy." Chandler said he placed the stick outside his tent before leaving the encampment. He later identified the stick that was recovered outside his tent as the one used.

Chandler reiterated that the fight was already occurring when he arrived. He stated Molina was just trying to protect the camp and "got carried away." They had told Barnes to stay away from the encampment in the weeks before the incident because he was stealing. Chandler added that he was "the last person up there," and that "the only reason I hit the guy was because they were protecting the tents" and he believed it "wouldn't be right for them to [unintelligible] protect them and me not even do anything to protect it myself."

*The jury instruction conference*

During the jury instruction conference, Chandler requested several lesser included offense instructions, including unintentional second-degree murder, voluntary manslaughter, and involuntary manslaughter committed either recklessly or as the result of a lawful act in an unlawful manner. The district court declined to instruct the jury on involuntary manslaughter committed as the result of a lawful act in an unlawful manner but agreed to give the other lesser included offense instructions for the jury to consider in a sequential order. This will be explored later in this opinion. After deliberating, the jury found Chandler guilty of intentional second-degree murder.

4

Before sentencing, a juror emailed the prosecutor to disclose that there was some confusion in the jury room about the meaning of the terms "intentional" and "unintentional" as applied to the charges in the case.

At sentencing, the district court began by denying Chandler's motion for judgment of acquittal and new trial based on sufficiency of the evidence and juror misconduct. On the jury misconduct argument, the court found the contents of the email alone did not justify recalling the jury because the email did not disclose misconduct and merely described aspects of the jury's mental processes in reaching the verdict. See K.S.A. 60-441; *State v. Franklin*, 264 Kan. 496, 504, 958 P.2d 611 (1998) (posttrial statements of juror expressing that there had been confusion about unanimity jury instruction held inadmissible). Moving to sentencing, the district court declined to grant a departure and imposed the presumptive sentence based on Chandler's criminal history score of F, ordering Chandler to serve 214 months in prison.

Chandler timely appealed.

ANALYSIS

I.    THE DISTRICT COURT DID NOT ERR IN FAILING TO GIVE A LESSER INCLUDED
      OFFENSE INSTRUCTION ON INVOLUNTARY MANSLAUGHTER

Chandler first argues that the district court committed reversible error when it refused to include a lesser included offense instruction on involuntary manslaughter under K.S.A. 2021 Supp. 21-5405(a)(4), or a killing that occurs "'during the commission of a lawful act in an unlawful manner.'" He contends omitting this instruction was reversible error because the jury could not consider whether he justifiably used excessive force to prevent the theft of a walking stick that Barnes had stolen. The State responds that this instruction was not factually appropriate because the evidence shows he hit

5

Barnes only after reclaiming the walking stick, and alternatively, that any error in failing to give the instruction was harmless.

When the defendant properly preserves the issue by objecting to the failure to give the instruction at the jury conference, as Chandler did here, we consider the merits of the claim to determine whether the district court erred in refusing to give the instruction. If we find that the district court did err, we examine whether the error can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

A. *The requested instruction was legally appropriate.*

To determine whether the court erred, we first consider whether the requested instruction was legally and factually appropriate. Our review of this issue is unlimited and requires us to examine the entire record. *Holley*, 313 Kan. at 254. As Chandler correctly notes, lesser included offense instructions are generally considered legally appropriate. *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019). The Kansas Supreme Court recognizes involuntary manslaughter as a lesser included offense of second-degree murder because both offenses are included within the five degrees of homicide. See *State v. Pulliam*, 308 Kan. 1354, 1362, 430 P.3d 39 (2018). So there is no dispute the requested instruction was legally appropriate.

B. *The requested instruction was not factually appropriate.*

Whether the requested instruction was factually appropriate requires more discussion.

To determine whether an instruction was factually appropriate, this court must consider whether there was sufficient evidence, viewed in the light most favorable to Chandler, that would have supported giving the instruction. *Holley*, 313 Kan. at 255. A

6

defendant is also generally entitled to an instruction on the law applicable to their theory of defense if supported by competent evidence. See K.S.A. 21-5108(c); *State v. Keyes*, 312 Kan. 103, 107-08, 472 P.3d 78 (2020). Competent evidence is defined as evidence that "could allow a rational fact finder to reasonably conclude that the defense applies." K.S.A. 21-5108(c). And our Supreme Court has recently clarified the standard even further to hold that "a court must consider whether there is *some evidence*, viewed in a light most favorable to the defendant, *emanating from whatever source and proffered by whichever party,* that would reasonably justify the defendant's conviction for that lesser included crime." (Emphases added.) *State v. Lowe*, 317 Kan. 713, Syl. ¶ 1, 538 P.3d 1094 (2023).

Chandler contends the requested instruction was factually appropriate because the facts presented at trial showed he justifiably used excessive force in defense of his property, as permitted by K.S.A. 21-5225. That statute provides:

> "A person who is lawfully in possession of property other than a dwelling, place of work or occupied vehicle is justified in the use of force against another for the purpose of preventing or terminating an unlawful interference with such property. Only such use of force as a reasonable person would deem necessary to prevent or terminate the interference may intentionally be used." K.S.A. 21-5225.

Chandler relies on decisions discussing the use of excessive force during an otherwise justifiable use of force for support. See *State v. Nunez*, 313 Kan. 540, 551, 486 P.3d 606 (2021); *State v. James*, 309 Kan. 1280, 1304, 443 P.3d 1063 (2019). In *Nunez*, the defendant claimed he shot the victim—who he believed was trying to rob his house— only after the victim had held the defendant by the neck and was holding a knife to him. The Kansas Supreme Court found the district court erred in omitting a similar instruction as the one requested by Chandler because there was evidence presented at trial to support that version of events, despite Nunez giving other conflicting statements. 313 Kan. at 552. Likewise, in *James*, the defendant claimed he followed the victim into a basement

7

and found himself surrounded by two men who appeared ready to fight the defendant and a third who the defendant believed had a gun. The Kansas Supreme Court found the district court erred in omitting the instruction because trial evidence supported the defendant's version of events that he was acting in self-defense. 309 Kan. at 1304.

These cases present different circumstances than those that exist here because they both involved evidence showing a lawful exercise of self-defense through excessive force. Here, Chandler claims he lawfully exercised excessive force to reclaim his stolen property by taking a walking stick back from the victim and repeatedly hitting him with it. He correctly points out that there was evidence presented at trial to show that he told police Barnes stole the walking stick and that witnesses observed Chandler beating Barnes with an object that looked like a pipe. But Chandler treats his retrieval of the stolen walking stick and the beating he inflicted upon Barnes as a single, lawful act, which oversimplifies the role Chandler played in Barnes' death.

As the State points out, the only evidence presented *at trial* about Chandler's use of force was his statement during the custodial interview that he hit Barnes four to five times in the stomach and arms "*with the stick that he stole from me* . . . after Abel was done beating on him [and] I took the stick away from the guy." (Emphasis added.) In other words, there was *no* evidence, emanating from *any* source or proffered by *any* party*,* that would reasonably justify the defendant's conviction for the lesser included crime. There was no evidence presented at trial that Chandler used force when he performed the specific act of retrieving the walking stick. In contrast, Chandler's statement to the police was that he only began using force *after* he had reclaimed possession of his property and after observing the severe beating inflicted by Molina.

To clarify, Chandler recites a more detailed version of events in the facts section of his brief: "as Barnes continued to swing the walking stick, *Mr. Chandler punched Barnes in the stomach* a couple of times to retrieve his property." (Emphasis added.) But

8

to support this recitation of the facts, Chandler cites to portions of testimony he gave at a pretrial hearing on a motion for immunity from prosecution. He also mentions that the prosecutor acknowledged Chandler used excessive force to defend his property when arguing against his immunity motion. Unfortunately for Chandler, none of that testimony was presented to the jury for consideration. And Chandler provides no authority allowing this court to consider evidence that was not presented at trial in support of a request for a jury instruction, nor to suggest that the prosecutor's pretrial statements should be considered as evidence. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) (failing to support a point with pertinent authority is like failing to brief an issue).

Moreover, Chandler's counsel argued in closing before the jury that Chandler arrived on the scene after Molina had beaten Barnes to the ground. He tells the jury that Chandler told Molina to stop. Seeing the victim on the ground is the moment he saw his pole—referring to his walking stick. He took the pole and tapped him a few times and punched him in the stomach. Nowhere in closing does he claim that Chandler removed the walking stick by force. Instead, he argues that any injuries that were inflicted by Chandler were after the fact and did not cause Barnes' death. He told the jury that Chandler was not even "on the bridge when Abel Molina attacked Blake Barnes." In other words all the life-threatening injuries had been inflicted on Barnes before Chandler got there. He does not claim that he needed to inflict injuries on Barnes to retrieve his walking stick. That was clearly not his defense. His defense was if he struck him, it was after the fact. It was after he simply leaned over Barnes badly beaten body to retrieve his stick and then he did not inflict any fatal blows.

Put simply, even viewing the evidence presented at trial in the light most favorable to Chandler, no rational fact finder would conclude that Chandler's use of force here was reasonably necessary to prevent or terminate the theft of his walking stick. Retrieving the stick from Barnes was a lawful act but no evidence shows that Chandler had to use force to do so. Instead, the only evidence presented *at trial* shows Chandler watched Molina

9

severely beat Barnes, picked up the walking stick, and then began hitting Barnes repeatedly with the stick as Barnes laid on the ground. A reasonable person would not find it necessary to begin beating someone who was already severely injured and laying on the ground to prevent or terminate interference with property which has already been reclaimed. This total absence of any facts supporting Chandler's requested instruction distinguishes this case from those where courts found instructions on lesser included offenses to be factually appropriate. See *Lowe*, 317 Kan. at 720; *Nunez*, 313 Kan. at 552; *James*, 309 Kan. at 1304.

In sum, because the requested instruction was not factually appropriate, the district court did not err in declining to give it to the jury.

II.     THE DISTRICT COURT DID NOT ERR BY INSTRUCTING THE JURY TO CONSIDER LESSER INCLUDED OFFENSES IN A SEQUENTIAL ORDER

When assessing the instructions given by the district court, appellate courts consider jury instructions without focusing on any single instruction in isolation, to determine whether they properly and fairly state the applicable law or if it is reasonable to conclude that they could have misled the jury. *State v. Buck-Schrag*, 312 Kan. 540, 553, 477 P.3d 1013 (2020). Our Supreme Court has "'strongly recommend[ed]'" using the pattern jury instructions unless the particular facts of a case warrant modification or supplementation of the pattern instruction. *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022).

Chandler's instructional challenge here is two-fold. First, he asserts that the district court erred by using ordering language for the lesser included offense instructions. Second, he contends that the district court erred by omitting an instruction modeled on PIK Crim. 4th 68.080 (2016 Supp.).

10

A. *Our Supreme Court has held that the court need not instruct the jury to consider the lesser included defense instructions simultaneously rather than sequentially.*

Chandler challenges the sequential ordering language in each lesser included offense instruction advising the jury that "[i]f you do not agree that David Chandler is guilty of [greater offense], you should then consider whether David Chandler is guilty of [lesser offense]." Chandler argues instructing the jury in this way prevented it from assessing the mitigating factors for lesser degrees of homicide. Yet, as he also notes, the Kansas Supreme Court addressed a similar challenge to sequential ordering language in *State v. Sims*, 308 Kan. 1488, 431 P.3d 288 (2018). There, the court explicitly rejected the argument that a court must allow "simultaneous consideration" of lesser included offenses when instructing the jury and overruled the precedent endorsing that view. 308 Kan. at 1499-1503. We are bound to follow Kansas Supreme Court precedent. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017).

B. *The district court was not required to give PIK Crim. 4th 68.080.*

Despite recognizing the *Sims* holding, Chandler contends the ordering language used by the district court here was problematic because the district court omitted another instruction that would have mitigated its error—PIK Crim. 4th 68.080.

"The offense of *insert principal offense charged* with which defendant is charged includes the lesser offense(s) of *insert lesser included offense or offenses*.

"You may find the defendant guilty of *insert principal offense charged*, *insert first lesser included offense*, *insert second lesser included offense*, or not guilty.

11

"When there is a reasonable doubt as to which of two or more offenses defendant is guilty, (he) (she) may be convicted of the lesser offense only, provided the lesser offense has been proven beyond a reasonable doubt.

"Your Presiding Juror should mark the appropriate verdict." PIK Crim. 4th. 68.080.

He bases his conclusion on the fact that the *Sims* court determined that the defendant's due process rights were not violated because the district court had provided another instruction modeled on PIK Crim. 4th 68.080. See *Sims*, 308 Kan. at 1504-05.

Thus he contends that the failure to mitigate the error, as the court did in *Sims*, was an indication that his constitutional right to due process was violated.

But *Sims* does not hold that an instruction modeled on PIK Crim. 4th 68.080 *must* be given to ensure a defendant's due process rights. And Chandler provides no other case in which the absence of such an instruction was held to be error. To the contrary, the Kansas Supreme Court has held that failing to give such an instruction is not error because the instructions, taken as a whole, sufficiently informed the jury of the reasonable doubt standard. See *State v. Brammer*, 301 Kan. 333, 348, 343 P.3d 75 (2015) (noting it is "not essential to convey [the] point" that "the jury cannot convict [defendant] of the charged offense if the State did not prove it beyond a reasonable doubt").

Moreover, Chandler makes a different due process argument than the one addressed in *Sims*. In *Sims*, the due process challenge was based on the defendant's constitutional due process right to present his theory of defense. Here, Chandler argues only that omitting the requested instruction deprived him of his due process right to have the prosecution prove the elements of the charges against him beyond a reasonable doubt. Just before instructing the jury on the elements of intentional second-degree murder and the lesser included offenses, the court instructed the jury on the State's burden of proof:

12

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Thus, contrary to Chandler's point, omitting an instruction modeled on PIK Crim 4th 68.080 did not prevent the jury from holding the State to its burden as instructed. The district court did not commit error.

III.   THE DISTRICT COURT DID NOT ERR BY DENYING A MOTION FOR NEW TRIAL BASED ON JUROR MISCONDUCT

For his third issue, Chandler argues the district court erred in denying a motion for new trial insofar as it was based on juror misconduct. The facts related to this claim of error follow.

Immediately after the trial ended, a juror, (Juror A) emailed the prosecutor to disclose that there was some confusion in the jury room about the meaning of the terms "intentional" and "unintentional" as applied to the charges in the case. Juror A expressed that she initially believed Chandler "did not plan, or intentionally plan to kill the victim." An unnamed juror

"pointed out, what was intentional was the fact he choose [*sic*] to strike the victim, which lead to the victims [sic] death. The act, was what was intentional. There were several others that thought the same thing until one juror put it into prospective [*sic*]. He explained that if someone had been drinking alcohol and they choose [*sic*] to get in their

13

car and drive, they have a car accident in which a person dies, doesn't mean they intentionally set out to have a car accident and kill someone, but the fact that they intentionally got in the car to drive, knowing they had alcohol in their system, that was what was intentional. It took several discussions for everyone to understand what 'intentional' meant for this trial."

The prosecutor promptly forwarded the email to defense counsel the following morning.

Two days later, Chandler filed written motions for a new trial and a judgment of acquittal, arguing generally that the evidence failed to support the jury's verdict and that Chandler's rights were prejudiced during trial. About a month later, Chandler supplemented these motions, arguing that prejudicial jury misconduct during jury deliberations as disclosed by Juror A's email warranted recall of the jury and a new trial.

The district court denied the motion. The court found nothing suggested that the discussion disclosed in the email was based on "sources of information that would be prohibited during the deliberative process." In other words, the court found the contents of the email alone did not justify recalling the jury because the email did not disclose misconduct and merely described aspects of the jury's mental processes in reaching the verdict. See K.S.A. 60-441; *State v. Franklin*, 264 Kan. 496, 499-500, 958 P.2d 611 (1998) (posttrial statements of juror expressing that there had been confusion about unanimity jury instruction held inadmissible).

*We review the district court's denial of a motion to recall the jury for an abuse of discretion.*

An appellate court generally reviews a district court's decision on a motion for new trial for an abuse of discretion. K.S.A. 22-3501(1) ("The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice.");

14

*State v. Davidson*, 315 Kan. 725, 728, 510 P.3d 701 (2022). Yet when a motion for new trial is based on juror misconduct, appellate courts apply a bifurcated standard of review.

> "When considering whether a new trial is warranted based on juror misconduct, the trial court first considers whether there was a fundamental failure in the proceeding. If a fundamental failure did occur, the trial court moves to the second step and considers whether the party benefitting from the failure has shown the trial can continue without an injustice, meaning the party has shown beyond a reasonable doubt that the failure did not affect the outcome of the trial. An appellate court reviews the trial court's decision in two parts. It reviews the conclusion on whether a fundamental failure occurred for an abuse of discretion. As for the second question—whether any failure resulted in injustice—an appellate court does not review the district court's decision for abuse of discretion but considers the entire record and performs its own constitutional harmless error review." *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 3, 422 P.3d 72 (2018).

While Chandler frames this issue primarily as appealing from the denial of a motion for new trial based on juror misconduct, his claim also concerns the threshold question of whether the district court should have recalled the jury. Appellate courts review a court's decision to deny a motion to recall the jury for an abuse of discretion. See *State v. Hirsh*, 310 Kan. 321, 343, 446 P.3d 472 (2019); *State v. Clements*, No. 119,306, 2021 WL 1836435, at *3 (Kan. App. 2021) (unpublished opinion). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). As the asserting party, Chandler bears the burden of establishing an abuse of discretion occurred. *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022).

The district court declined to recall the jury based solely on the contents of the email, finding that the email described aspects of the jury's mental processes, into which Kansas law prohibits inquiry. Chandler now challenges this ruling, arguing that the unnamed juror's misstatement of law could be explored without engaging in improper

15

inquiry. And because the unnamed juror's statement regarded an essential element of the offense and was communicated to other jurors, inquiry into those statements "is not questioning the mental process of one or more jurors but is describing an occurrence within the jury room having a material bearing on the validity of the verdict."

The district court instructed the jury in Instruction No. 11 that "[a] person acts intentionally when it is the person's desire or conscious objective to: [a.] do the act complained about by the State; or [b.] cause the result complained about by the State." The State does not appear to contest that the definition given by the unnamed juror as described in Juror A's email was a misstatement of the law. K.S.A. 21-5202(h) (defining intentional); *State v. Craig*, 311 Kan. 456, 464-65, 462 P.3d 173 (2020) (recognizing intentional second-degree murder as a specific intent crime requiring intent to kill). Rather, the State argues the information described in the email fits squarely within the prohibition against inquiry into the jurors' mental processes. In the alternative, the State argues Chandler was not prejudiced by any error because nothing in the record shows the jury engaged in improper conduct or turned to outside sources to resolve their disagreement about the instructions. Chandler's argument is not persuasive.

The relevant statutes are K.S.A. 60-441 and K.S.A. 60-444(a). K.S.A. 60-441 limits the inquiry into the validity of a verdict by prohibiting introducing evidence "to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined." K.S.A. 60-444(a) further provides that "[t]his article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441."

16

Here, the district court reached its conclusion based on the Kansas Supreme Court's decision in *Franklin*, which reviewed relevant caselaw and then summarized the interplay between these statutes as follows:

"A juror may not impeach his or her verdict on any ground inherent in the verdict itself or divulge what considerations influenced him or her in arriving at the verdict. Inquiry may be made into the extrinsic matters of physical facts, conditions, or occurrences of juror misconduct, either within or without the jury room, which were material to the issues being determined.

"We conclude that the trial court correctly held that the testimony of the two jurors was improper under K.S.A. 60-444(a) as an effort to impeach the verdict by showing the mental processes by which the verdict was reached." 264 Kan. at 503-04.

*Franklin* involved a defendant convicted of voluntary manslaughter, a lesser offense of the charged crime of intentional second-degree murder. After the verdict, a juror came forward and revealed to defense counsel there had been confusion among the jurors about the unanimity instruction. The State objected to calling the jurors as witnesses at a hearing on the motion, but the district court overruled the objections and allowed the jurors to testify so the defendant could establish a record. In their testimony, the jurors explained they had compromised on finding the defendant guilty of the lesser included offense despite their minority view that he acted in self-defense because they believed the verdict needed to be unanimous. The trial court denied the motion for new trial after finding the testimony was improper inquiry under K.S.A. 60-441. The Kansas Supreme Court agreed and affirmed, explaining that the jury was correctly instructed that the verdict must be unanimous and then each juror acknowledged they agreed to the verdict when polled. 264 Kan. at 504-05.

As Chandler notes, one of the cases supporting that conclusion in *Franklin* was *State v. Kaiser*, 260 Kan. 235, 918 P.2d 629 (1996), *disapproved of on other grounds by*

*State v. Gonzalez*, 282 Kan. 73, 145 P.3d 18 (2006), another case with similar circumstances that illustrates how these statutes operate together. In *Kaiser*, a juror submitted an affidavit explaining that she was pressured by other members of the jury panel into voting guilty, despite her belief that the defendant was not guilty. As in *Franklin*, the district court declined to recall the other jurors and denied the defendant's motion for new trial. The Kansas Supreme Court affirmed, concluding that the jury was properly instructed to reach a unanimous verdict and the juror indicated that she agreed to the verdict. 260 Kan. at 252.

Chandler argues *Franklin* and *Kaiser* are distinguishable because Juror A's email goes beyond the jury's mental processes and involves a material misstatement of law by an unnamed juror, thus allowing inquiry under K.S.A. 60-444(a). As support, he cites two cases in which the Kansas Supreme Court held it was proper to inquire about whether jurors had consciously conspired to disregard the court's jury instructions. See *Williams v. Lawton*, 288 Kan. 768, 801-02, 207 P.3d 1027 (2009) (juror affidavit stating jury had agreed to apply an improper quotient verdict); *Verren v. City of Pittsburg*, 227 Kan. 259, 261-62, 607 P.2d 36 (1980) (juror affidavits stating jury had improperly included award for attorney fees in damages). Chandler also references a California case, in which jurors stated that another juror "'consulted'" his own experience as a police officer and gave erroneous legal advice to the jury panel, ultimately resulting in the defendant's guilty verdict first-degree murder and robbery. See *In re Stankewitz*, 40 Cal. 3d 391, 399, 708 P.2d 1260 (1985). The California Supreme Court granted a writ of habeas corpus after finding the juror's misconduct involved erroneous statements of law that prejudiced the defendant's rights to a fair trial. 40 Cal. 3d at 402-03. Chandler asserts this case is like *Stankewitz* because the unnamed juror consulted his own incorrect understanding of the definition of intentional instead of following the jury instructions, then communicated that definition to the entire jury.

But we do not rely on *Stankewitz* to address Chandler's claim because the Kansas Supreme Court has already spoken on this point. In *State v. Childers*, 222 Kan. 32, 563 P.2d 999 (1977)—which neither party cites— the jury convicted the defendant of intentional second-degree murder and a conversation between defense counsel and the jury foreperson led counsel to believe the jury had misinterpreted the culpable mental state instruction defining intentional. Our Supreme Court held that K.S.A. 60-441 controlled because "the matter sought to be explored was not extrinsic to the verdict and thus was inadmissible." 222 Kan. at 39; see also *Smith v. Union Pacific Railroad Co.*, 214 Kan. 128, 134-35, 519 P.2d 1101 (1974) (finding affidavit based on juror confusion about instructions inadmissible under K.S.A. 60-441). Chandler does not challenge the court's jury instruction on the definition of intentional, and inquiring into potential confusion among the jurors about the meaning of the instructions would contravene the prohibition in K.S.A. 60-441. We therefore find that the district court did not abuse its discretion in declining to recall the jury to testify about potential juror confusion about the instructions or in denying Chandler's motion for new trial.

IV.    THE CUMULATIVE ERROR RULE DOES NOT APPLY WHEN THERE WAS NO ERROR

For his final argument, Chandler argues the cumulative effect of the jury instructional errors and the jury misconduct described above deprived him of a fair trial.

This court may reverse a case when the totality of the circumstances show that a defendant was substantially prejudiced by cumulative errors and denied a fair trial. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022). But because there are no errors to accumulate, this court has nothing to evaluate collectively for cumulative error. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Affirmed.