IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,945

STATE OF KANSAS,
*Appellee*,

v.

GROVER D. JAMES,
*Appellant*.

SYLLABUS BY THE COURT

1.

On the conflicting evidence admitted at trial in this homicide case, the district judge erred by refusing to give lesser included offense instructions for reckless second-degree murder, reckless involuntary manslaughter, and imperfect self-defense involuntary manslaughter. None of these errors, evaluated for harmlessness under the state statutory standard, was reversible standing alone.

2.

A district judge is not required to instruct a jury to consider a lesser included homicide offense simultaneously with any greater homicide offense.

3.

Autopsy photographs, like other photographic evidence, are relevant if they have a reasonable tendency to prove a material fact. A district judge does not abuse his or her discretion by admitting autopsy photographs that are used by an expert witness to explain the path of a fatal bullet and the victim's resulting skull fractures.

1

4.

A prosecutor commits error when he or she states during closing arguments that a car was "stolen" despite an absence of evidence supporting a theft or criminal deprivation. In this case, such an error was harmless under the governing constitutional standard.

5.

A continuance hearing is a critical stage at which a criminal defendant has a constitutional right to be present, unless he or she has knowingly and voluntarily waived that right. Assuming a violation of the defendant's right occurred in this case, the error was harmless under the governing constitutional standard.

6.

Cumulative error does not require reversal of the defendant's convictions in this case.

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed June 28, 2019. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, argued the cause, and *Sam Schirer*, of the same office, was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  This is defendant Grover D. James' direct appeal of his convictions for first-degree premeditated murder of Leon McClennon and criminal possession of a firearm.

James challenges the district judge's refusal to give certain lesser included homicide instructions and failure to tell the jury to consider certain homicide offenses simultaneously. He also challenges the admission of autopsy photographs into evidence, alleges reversible prosecutorial error, and asserts he was deprived of his constitutional right to be present at all critical stages of his trial. James also argues that cumulative error requires reversal of his convictions.

Although we identify errors in James' case, the errors are not reversible standing alone or cumulatively. For the reasons outlined below, we affirm James' convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Resolution of James' appellate issues require an unusually extensive review of the factual and procedural background of this case.

On the night of May 8 and into the early morning hours of May 9, 2015, Rance Kindred's friends and family threw him a birthday party, held in the basement of the Parrot-fa-Nalia dress shop in Wichita. The party was attended by a variety of Kindred's friends and family, including:  Grover "Boo" James, Kindred's friend; August Hughes, James' girlfriend; Keialsha James, James' sister; Torey West, Kindred's girlfriend and James' sister; Artadius "Ta Ta" Johnson, Kindred's son; and Leon "Fat Head" McClennon, Johnson's cousin and Kindred's nephew.

3

Johnson and McClennon ended up at the party after Johnson spoke with Kindred on the phone. At the party, Kindred introduced James and Johnson for the first time. Kindred would testify that he had "wanted them to meet each other" but "it went bad right away because Ta Ta [Johnson] swolled up," that is, swelled his body in a confrontational manner. See Urban Dictionary, https://www.urbandictionary.com/define.php?term=swole (last visited June 28, 2019). The tension between the two escalated throughout the evening over a perception that Johnson was "mugging" James. On more than one occasion, Kindred told Johnson that he needed to "squash" his issues with James.

At some point in the evening, Johnson left with McClennon and another cousin before he returned to the party to "chill with [his] auntie and stuff." According to Johnson, Kindred made another attempt to convince Johnson to "squash" things with James, which caused Johnson to "want[] to fight." But before things escalated too far, another of Johnson's cousins—Anita Jones—grabbed him and calmed him down.

After this confrontation, many of the guests began leaving the party. Johnson and McClennon stayed to help clean up. James and Hughes initially left the party, but, Hughes would eventually testify, she remembered she had offered to help clean up; so she and James went back.

Surveillance camera footage captured what happened in the Parrot-fa-Nalia parking lot and outside the entrance to the basement upon James and Hughes' return. The footage would later be admitted at James' trial.

When James and Hughes pulled into the Parrot-fa-Nalia parking lot, Johnson and McClennon were outside. At that point, Johnson and McClennon immediately went down to the basement. Trial testimony would establish that the door at the bottom of the stairs to the basement was shut and could not be opened from the outside.

4

Surveillance footage from inside the door shows that Keialsha, James' sister, opened the door. Johnson and McClennon can be seen coming through the door, followed almost immediately by James. Hughes came through the door a moment later.

The events that followed inside the basement—outside the view of any surveillance camera—were disputed at trial. It is undisputed, however, that James fired two shots, one of which hit McClennon in the head, killing him. The internal surveillance footage then shows, approximately 37 seconds after the group had moved off camera, McClennon stumbling headfirst to the floor, where his motionless body comes to rest. While McClennon's body is lying on the ground, James walks past it and back up the stairs. Hughes follows him.

After the shooting, James drove Hughes' car to Oklahoma. He was apprehended there and was charged with first-degree premeditated murder and unlawful possession of a weapon.

James' first appearance on the charges was in later October 2015. On December 14, 2015, James filed with the clerk of the court a letter he had written to his then-attorney Brad Sylvester. The letter asked Sylvester to take certain actions in his case. James asked Sylvester to "file and pursue any and all necessary paperwork to insure a speedy trial, I'd also ask you to file a 180 day writ [and] a motion for statutory speedy trial." James later reiterated a request that Sylvester "vigor[o]usly pursue" his "speedy trial" and asked that Sylvester "not continue my preliminary hearing . . . or continue my trial ever." James also asked to be present at "any and all hearings . . . when my case is d[i]scussed."

After District Court Judge David J. Kaufman found probable cause at James' January 13, 2016, preliminary hearing, James waived arraignment and the case was set for jury trial on February 16, 2016.

On February 16, Sylvester requested a continuance in a filing titled, "Notice and Order Concerning Defense Counsel's Request to Continue Trial after Consultation with the Defendant." District Court Judge Jeffrey E. Goering granted the request to continue the case and reset trial for March 14, 2016. The form document, which was signed and submitted by Sylvester, contained the following paragraph:

> "'In submitting this request to the Court, the named defense counsel represents to the Court that counsel has consulted with the named defendant about this continuance and this continuance is to be charged to the defendant pursuant to K.S.A. 22-3402(g).'"

On March 16, Sylvester asked for another continuance, using an identical form document. Judge Goering again granted the request and reset trial for June 6, 2016.

On April 14, James filed a motion seeking to dismiss counsel. James alleged an irreconcilable conflict and complete breakdown of communication. That same day, the motion was set for hearing on April 22, 2016.

James was present for the motion hearing before District Court Judge John J. Kisner, Jr. On April 22 Judge Kisner acknowledged James' previous concerns over a speedy trial. Judge Kisner informed James that recent caselaw required that any further continuances would require James to sign off on them or attend a hearing. Judge Kisner denied the motion to dismiss counsel and informed James that any appointment of new counsel would mean more time for trial preparation. James responded, "I'm not worried about the time."

6

During the hearing, the court and parties discovered that a June 6 start date for trial—the date that had been set on March 16—conflicted with the court's schedule. Trial was reset for July 11, 2016. Judge Kisner advised James that the time would not be charged to the State and asked if James was agreeable to the new trial date. James said he understood and agreed to the new date.

On June 15, 2016, James filed an Objection to Continuance.

"COMES NOW, the Defendant, *pro se*, formally objecting to any continuance sought by either the State or defense counsel in the above entitled action. The defendant further asserts his statutory, K.S.A. 22-3208(7), and Fourteenth Amendment Due Process right to appear at all 'critical stages' in a prosecution including any proceeding where the court may order that the Defendant has waived any constitutional or statutory right."

The same day, James moved to dismiss the case with prejudice. James alleged that his "statutory right to a fast and speedy trial, and his constitutional right to Due Process and fast and speedy trial" had been violated.

In his motion, James set out a timeline of events, alleging that his trial had been continued by his attorney on February 16, March 14, and June 6, outside of James' presence and against his "clear wishes." James further alleged, "At no time has the defendant been present in the courtroom or by video, and asked if he agreed to the continuance or given the opportunity to object to the continuance" and that "[t]here are no signed waivers of speedy trial or signed acknowledgments of continuance." According to James, the time the State had to bring him to trial under K.S.A. 22-3402 began to run on January 13, 2016, the date of his preliminary hearing, and expired on June 12, 2016.

7

The same day James filed his pro se motion, the district court clerk sent Sylvester a letter advising him of the filing and saying that no further action would be taken unless Sylvester directed otherwise.

On June 20, James filed another motion seeking to have Sylvester replaced. In an affidavit filed the next day, James alleged he had informed Sylvester in writing that he wanted to be present at all hearings but Sylvester had nevertheless failed to consult him about any of the previous continuances. James further alleged that he had not been given the opportunity to appear at any of the continuance hearings and that, had he been present, he would have objected to any continuance.

On July 1, Judge Kaufman heard James' motion for new counsel. James explained that he felt there was a communication breakdown between himself and Sylvester because of the continuances Sylvester had requested without James' knowledge.

The State contradicted James' assertion that he had not been present or known about any of the continuances, alerting the court to James' presence at the April 22 hearing and his agreement to the continuance granted that day.

James acknowledged that the State was correct but insisted the April 22 continuance was not the only one.

> "It's several continuance[s]. I have it in my ROA that it's been continued by the defense
> that I did not sign off on or anything, didn't know it. I also filed a motion for . . .
> dismissal of case for fast and speedy trial violation, constitutional and statutory rights."

The State conceded that James had filed a motion to dismiss based on a speedy trial violation. The motion had not been docketed for hearing because it was filed pro se.

8

Judge Kaufman ultimately granted James' request for new counsel.

On July 11, Judge Goering continued the trial setting again despite James' in-court refusal to agree to it. James' new counsel had yet to receive any discovery. The State asked for a continuance of the trial until September 12 because of the unavailability of one of its witnesses. Judge Goering granted the State's request over James' objection and set a "firm" trial date of September 12.

New counsel was appointed on three occasions in late August and early September, culminating in Steven Mank's appointment on September 1. Mank would represent James through the trial but be replaced before sentencing.

On September 12, Judge Goering signed off on another trial continuance, continuing the case from September 12 to November 14, 2016. His order is a form document similar to those filed by Sylvester in February and March. However, unlike the earlier forms, this one required the defendant's signature approving the continuance. The form shows James signed and dated it on September 10.

James' trial began on November 14, 2016, and was presided over by District Court Judge Stephen Ternes.

At trial, the video surveillance footage from Parrot-fa-Nalia was introduced through the testimony of Wichita Police Detective Robert Chisholm.

Chisholm's testimony was followed by the testimony of Dr. Timothy Gorrill, the forensic pathologist who conducted the autopsy of McClennon.

Before Gorrill testified, Mank objected to admission of certain of the State's anticipated autopsy photograph exhibits. Mank argued that the exhibits in question "are not necessary to describe the manner of death or what happened to the victim in this case. They are rather strong photographs. . . . [W]e would object to them for being overly gruesome and  . . . not warranted in this case." The State argued that the challenged photos were necessary for Gorrill to explain the autopsy.

Judge Ternes overruled the objection. He acknowledged that the photos were "somewhat graphic," but "autopsy photos tend to be that way." Without hearing Gorrill's testimony, Judge Ternes could not say the challenged photos were unnecessary. Mank renewed his previous objection when the State introduced the autopsy photos during Gorrill's testimony. The judge again overruled the objection.

The first four photos showed McClennon's body, including closeups of his head and the gunshot wound. Specifically, one image showed an "obvious injury" at the bottom of McClennon's ear. Another showed a "skin defect, a hole, a gunshot wound." Gorrill concluded that this injury was an entry wound because there was no "exit defect" and they had "recovered a bullet along the path."

The following photos were the focus of the defense objection.

Exhibit 38 showed "the top of Mr. McClennon's skull" after his scalp had been "reflect[ed] back  . . . with a scalpel." Gorrill highlighted a fracture in McClennon's skull that could be seen in the image.

Exhibit 39 showed the base of McClennon's skull after a bone scalpel or saw had been used "to remove that part of the skull" and then the brain removed. Gorrill noted multiple skull fractures in the image. Based on the location of the fractures, Gorrill was

10

able to describe the likely path of the bullet. Gorrill concluded that the bullet entered the left side of McClennon's head, traveled through his skull, and caused the fractures shown in the photo.

Exhibit 40 showed "the interior of [McClennon's] neck, the vertebral column" after the "neck structures" had been removed. Gorrill pointed out the projectile, which was "in one piece up here in the back of the neck" in the photo. He then indicated on his own body the approximate location where the projectile would have been lodged. He described the location as "[k]ind of in the neck area."

Gorrill concluded "within a reasonable degree of medical certainty" that the cause of McClennon's death was a "[g]unshot wound to the head" and that the manner of death was homicide.

The State's main witnesses on the events that occurred off camera in the basement were Johnson and Kindred.

Johnson testified that he and McClennon had not planned on going to the party that night, but Kindred called Johnson and asked him to come. Johnson did not know James but had seen him before.

After Johnson arrived at Parrot-fa-Nalia, he took a phone call in the parking lot. Kindred approached with James. Kindred "[t]old me [James'] name, said it was Boo, told Boo like who I was, told us we need to squash whatever was going on."

Johnson said James was upset about Johnson's romantic relationship with James' niece. Johnson said he told James, "I was grown, she was grown." "He wanted me to

11

leave her alone, told me to leave her alone and end it. I felt disrespected by it because we both grown."

At that point, Johnson's cousin grabbed him and they left the party with McClennon. They were gone 45 minutes to an hour. After Johnson "cooled down a little bit," Johnson and McClennon returned to the party. Johnson testified that he had just gotten out of prison and "wanted to spend time with everybody."

Kindred and James approached Johnson again after he returned. Kindred told Johnson that he was "mugging" James and that

> "you know, need to squash this, this and that. We need him on our side. I got upset. That's when I wanted to fight. That's what I like to do, so I wanted to box. My cousin, Puddin, she came and stopped me. Anita Jones, she came and grabbed me, took me to the back, you know. She tried to squash it, break it up. They kept messing with me, so everybody got kind of mad. That's when my [dad] said the matter was over with, everybody started leaving and stuff."

Johnson denied "mugging" James at the party, saying, "No. If I was mugging him, I would have approached him." For clarity, the Urban Dictionary describes "mugging" as "star[ing] or look[ing] at someone with malignant thoughts or intentions." Urban Dictionary, https://www.urbandictionary.com/define.php?term=Mugging (last visited June 28, 2019).

As most people, including James, left the party, Johnson and McClennon stayed with Kindred and several members of James' family.

Just after Johnson finished helping to load speakers in the parking lot, he "heard some tires screeching pulling in the parking lot." Johnson looked up and saw "a black

Jeep Cherokee . . . pulling in real fast." The driver was wearing a blue hat and a blue shirt, which was what James had been wearing.

Johnson testified, "[I] [g]rabbed my cousin and ran downstairs, back down the stairs but the door was shut." They "[b]anged on the door, . . . tried to get in before he came . . . around the corner." Neither he nor McClennon was carrying a weapon, and Johnson thought James was coming after him,

"[b]ecause we had gotten into it. I been in the streets for a lot of years, you know. So my intuition kicked in. I already knew what was going on. He pulled in too fast, didn't look right. We had been getting into it. It wasn't right, something wasn't right. Plus no matter what, he was coming back. No matter what, I had my little cousin with me so I had to protect him, tried to."

Keialsha opened the door. Johnson and McClennon pushed their way in and ran to Kindred, who was standing by the dance floor talking to his family. Johnson told Kindred that "his home boy was coming down the stairs with his gun, to get [Johnson]."

Kindred told Johnson that

"it was my fault, deal with it. I always wanted to be a gang member . . . . [B]asically saying, you know, it's on me. I got to deal with that . . . he ain't going to jump on it. He stood on the left on the side of me. Fat Head was on the right side of me. I was in the middle. He just told me it's your fault basically."

Kindred did not try to talk to James but Johnson

"kept telling [James] to put the gun down, kept telling him when he walked in there, came in there, he kept, you know, hollering am I tripping out 'cause this, this and that. I

13

kept telling him put the gun down, man, just put the gun down. You ain't got to go there, just put the gun down."

In addition, James' "mom and his sisters was in front of him telling him to stop. It wasn't worth it, just an argument . . . . That's when he fired in the air. I grabbed my cousin, turned around, told him to come on."

After the first shot was fired, Johnson ran toward the back door. He did not look back because he felt "bullets flying past [his] head." Johnson soon realized McClennon was not behind him. The door had locked behind Johnson, and he ran to the front of the building to find out what had happened. When Johnson descended the front stairs to the basement, he saw McClennon's body on the floor.

Johnson also testified that none of this would have happened if he had brought a gun with him, because he would have shot James first.

During cross-examination, Johnson admitted that he had wanted to fight James that night but claimed that McClennon did not want to fight. When confronted with a description of his earlier statement to police "that your cousin took his shirt off to fight [James]," Johnson called defense counsel Mank a liar and denied making the statement.

Mank also asked Johnson if a third person, someone named "Travis," was also at Parrot-fa-Nalia that night. Johnson admitted that Travis had been there "for like ten minutes." Travis' last name is not included anywhere in the trial transcript.

Kindred's version of events were presented to the jury through a video taken the day after the shooting and through live testimony. In the video, Kindred had explained what happened to McClennon's sister.

14

Kindred testified that Johnson had called him on the night of the party to see if Johnson could come to the party and bring McClennon. Kindred told him, "No. The police be checking this building. [McClennon's] underage." Despite Johnson's disregard of this warning, Kindred introduced Johnson to James because he wanted them to meet, but "it went bad right away because Ta Ta swolled up."

In the video, Kindred was asked whether James had said he was leaving the party to get a gun. According to one unidentified person who can be heard in the video, several people had heard James make such a statement. Another unidentified person also reported hearing James' mother say that James was leaving to get a gun. Kindred said that was not true, based on James' post-shooting comments to him. James had told Kindred that he always had a gun with him, and that if he had wanted to shoot anyone, he would have done so earlier.

Kindred also said in the video that the door into the basement had been shut because he wanted to show everyone how Johnson had been "mugging" James throughout the night; Kindred did not want Johnson to walk in during the demonstration.

Kindred also told McClennon's sister that he told "Ta Ta" after the first altercation to leave "Boo" alone because they needed to keep "Boo" on their "team." According to Kindred, "Boo" was "a killer." He will "kill [someone] out here and don't give a fuck about it."

In the video, Kindred also said Johnson and McClennon had run into the basement and then run behind him. Johnson and McClennon were telling Kindred that James was his "boy" and that he could stop James. Kindred said he walked toward James and tried to explain who McClennon and Johnson were and persuade James not to shoot them.

15

Kindred believed he had convinced James to stop, but Johnson and McClennon were standing on the dance floor, acting as if they were preparing to fight, and saying "let that nigga go."

Kindred told James that if he wanted to fight Johnson and McClennon, he could, but he needed to put the gun away. Believing James had put the gun in his pocket, Kindred moved out of the way, expecting a fight to ensue. But, as soon as he moved out of the way, he saw James put the gun in his right hand and shoot into the air.

In the video, Kindred further explained Johnson and McClennon ran different directions when James fired. Kindred ran behind James. Kindred did not say whether he believed James intended to hit McClennon with the second shot fired. He saw McClennon start to stumble and go down. Initially he thought McClennon was just ducking; Kindred realized McClennon had been hit when his body went limp.

After being shown the video at trial, Kindred testified he had lied when he told McClennon's sister James always "roll[ed]" with a gun. According to Kindred, "if I know he had a gun, I would have told him don't come to my party with no gun."

During cross-examination, Kindred testified that Johnson had "called some guys to come to the party." Kindred did not think they should be at the party, "because the guys he called, I know that they gang members. They Folks."

After Johnson's friends arrived, someone told Kindred that Travis had a gun. Kindred confronted Travis and told him: "If you got a gun, you better get it out of here right now." Travis told Kindred that he had a gun but "didn't bring it up here for no problems." Kindred started to walk away, but Travis called him back and told him, "If I bring a pistol to something like this, I ain't bringing it to give to nobody else. I can use it

16

myself." Kindred replied, "[Y]eah, but you ain't going to do it up in here because if you do, I'm going to fuck you up."

Kindred was asked if he "remember[ed] [Travis] being there prior to the shooting, like immediately prior to the shooting" and responded, "He was there the whole time."

After the State concluded its case-in-chief, Hughes, West, and James testified for the defense.

Hughes testified that she and James left the party to go home but came back when she remembered she had promised to help clean up. When they returned to Parrot-fa-Nalia, Hughes stayed outside for a moment to smoke before going downstairs.

When she got downstairs, she saw a confrontation around the dance floor. "I just seen a crowd of people rushing towards Boo as I was walking towards his mom who was sitting at the table cleaning it off." She saw "three or four boys" approaching James, one of whom was Travis. As the group approached James, she heard one of them say "what's up now[?]"

Hughes then heard a gunshot and started to run. She heard a second gunshot and, when she looked up, saw McClennon on the floor. Hughes then continued running, leaving Parrot-fa-Nalia with someone else. By the time she reached the outside of the building, both James and her car were gone.

West testified that some of Johnson's friends, including Travis, had shown up at the party earlier in the evening. At some point, she noticed Travis had a pistol. West told Kindred about the pistol but was not sure whether he had done anything about it.

West did not see what had caused the final confrontation. She explained,

"We were cleaning up. The party was over. Pretty much everyone was gone. It was more a majority of women down in the party still cleaning up. We heard a big bam at the door. I'm not sure who opened the door, door came flinging open.

"I saw my brother and girlfriend back up. He had her behind him like backing up. Three guys came . . . . [James] was pushing her around [a bench] so that he wouldn't fall and get back there. One guy came on the side, one stood on a thing right here (indicating) and one stood on the dance floor."

West claimed Travis was there at the time. "He was standing by the long side of the thing on the side of the building like inside the building like it separated the dance floor and the bar." According to West, Travis was wearing an orange shirt. She heard someone yelling, "[Y]eah, what's up nigga now[?]" When asked who yelled, West said it was Johnson.

West saw Johnson take his hoodie off like "[h]e wanted to fight." She saw that "Leon [McClennon] was in his stance like trying to go towards where everybody else was at and [Travis] was standing along the side of that bank with his hand behind his back."

West then heard but did not see a gunshot. She did not know who had fired. When she heard the shot, she ducked and then heard a second shot. West stayed down after the second shot and did not see what happened. When she got up, everyone was gone. She saw McClennon on the floor and stayed with him until police arrived.

James testified that he did not know either Johnson or McClennon before the party and did not know anyone in the "younger" group at the party. When James met Johnson, it did not go well because of a "little thing on Facebook" between Johnson and James'

18

nephew. According to James, after the initial introduction, Johnson was "mugging" him as if he had a problem with him.

James and Hughes left the party, but came back because Hughes wanted "to help [and] wanted to get a plate." When they returned, James walked into the basement immediately after Johnson and McClennon. James' testimony continued:

"When I come in, Rance[ Kindred is] standing right there. I'm walking up to Rance. August [Hughes] walks toward my mother when I walked in. Ta is like what up now, nigga. So I look at him like you want to trip now. So he was standing maybe I'd say 10, 15 feet into the dance floor.

"I walk right past Fat Head when I walked in. He didn't say nothing to me. I didn't have no problem with the brother. I don't know him. So he was standing there. He walked behind me like towards the—more towards the tables.

"Then there was another cat out there at that time. I didn't know who he was. He had on an orange shirt. He was standing there. Rance called to me. He was like kind of pushing me back. So we stood there for a minute[.]

. . . .

[Kindred was saying,] Calm down, bro. Don't trip on that. Don't trip on that, and then after that it just—everything exploded from there I mean.

. . . .

"Ta Ta is standing there like this, right. Yeah. What's up now nigga, puffing all up (indicating). I see Fat Head take off his hoodie. He's standing like to the side of me. The other dude is standing back there, but he's standing back there like this like yeah, you know (indicating [with right hand behind his back])."

19

James interpreted the "other dude['s]" action to mean "[t]hat he had a gun. He had something." James did not see a gun but saw "something flash, was like silverish."

The three kept coming toward James, James said. "I pulled out my gun and I fired and then I fired again." James testified that he was not firing at anyone.

James also testified that he had the gun on his "hip" the entire night and that he was carrying it because it is

> "[c]razy out here, man. I just lost an acquaintance of mine maybe two weeks before that. My niece, Reesha . . . was killed about a month before that. Another friend of mine was on the highway and the car pulled up beside him and gun—tried to gun him down. It's just—I was keeping it for protection.
>
> . . . .
>
> "I was in fear for my life. I didn't know what they was going to do to me. I seen a friend of mine maybe five or six months ago, some dudes jumped him, stomped him crushing his skull, killed him."

After the shooting, James left Parrot-fa-Nalia. "I get in the truck, and I just drove, man." He ended up in Oklahoma. He was,

> "[s]cared man. I had never been in no situation like that in my life. Then when I did talk, I had talked to Rance [Kindred]. When he told me like the baby, you know, Fat [Head] had died, that was a baby. That was a kid, dude. That wasn't my intention to hurt that man. I didn't know him. I have a 17-year-old son. I don't know what I would do if it was my son."

20

James requested jury instructions on the lesser included crimes of second-degree murder, voluntary manslaughter, and involuntary manslaughter for the first-degree murder charge.

The State opposed an instruction on second-degree murder under a theory that James had killed McClennon "unintentionally but recklessly under circumstances that show extreme indifference to the value of human life." See K.S.A. 2018 Supp. 21-5403(a)(2). It argued that the evidence was "clear [James] fired two shots" and the "second shot was fired directly at Fat Head and hit him in the left side of the face. . . . That was an intentional act." If a second-degree murder instruction were to be given, the State urged Judge Ternes to limit it to intentional second-degree murder. See K.S.A. 2018 Supp. 21-5403(a)(1).

Mank argued that sufficient evidence supported instruction on both theories of second-degree murder.

> "Mr. Kindred testified [James] told him he didn't mean to hit anybody. The fact that one shot apparently was fired straight up into the ceiling I think goes to show that at least as far as the first shot goes, he wasn't intending to shoot or hit anybody, ever."

Judge Ternes agreed with the State. "The way that I see it is it would be inconsistent I believe with the testimony of the defendant who clearly said at least twice that he was fearful of this group that he says surrounded him. It would be inconsistent then for him to fire recklessly." On the same rationale, Judge Ternes also denied James' request to instruct on reckless involuntary manslaughter. Mank objected unsuccessfully.

The State also opposed the voluntary manslaughter instruction sought by the defense, but Judge Ternes ultimately included voluntary manslaughter instructions on the theory of imperfect self-defense.

Mank also sought an involuntary manslaughter instruction on the theory James committed a "lawful act in an unlawful manner," i.e., "excessive use of self-defense." See K.S.A. 2015 Supp. 21-5405(a)(4). The State objected, arguing it was not appropriate because it required an "unintentional act and all the evidence shows this was an intentional act."

The judge declined to give the instruction because he could not "go all the way to involuntary manslaughter." He did not believe the evidence supported such an instruction.

The final instructions read to the jury before closing arguments included:

"Instruction No. 4, in Count 1 the defendant is charged with murder in the first degree. The defendant pleads not guilty. To establish this charge each of the following claims must be proved:  No. 1, the defendant intentionally killed Leon McClennon. No. 2, the killing was done with premeditation. No. 3, this act occurred on or about the 9th day of May, 2015, in Sedgwick County, Kansas.

. . . .

"Instruction No. 5, if you do not agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree.

"To establish this charge each of the following claims must be proved:  No. 1, the defendant intentionally killed Leon McClennon. No. 2, this act occurred on or about the

22

9th day of May, 2015, in Sedgwick County, Kansas. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State.

"Instruction No. 6, if you do not agree that the defendant is guilty of murder in the second degree, you should then consider the lesser included offense of voluntary manslaughter. To establish this charge each of the following claims must be proved: No. 1, the defendant knowingly killed Leon McClennon. No. 2, it was done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person. No. 3, this act occurred on or about the 9th day of May, 2015, in Sedgwick County, Kansas.

. . . .

"No. 7, the offense of murder in the first degree with which the defendant is charged includes the lesser offenses of murder in the second degree and voluntary manslaughter. You may . . . find the defendant guilty of murder in the first degree or murder in the second degree or voluntary manslaughter or not guilty.

"When there is a reasonable doubt as to which of the two or more offenses defendant is guilty, he may be convicted of the lesser offense only, provided the lesser offense has been proven beyond a reasonable doubt. Your presiding juror should then mark the appropriate verdict.

"Instruction No. 8, defendant claims his use of force was permitted as the defense of a person. [The] defendant is permitted to use physical force against another person including using a weapon when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force.

"Reasonable belief requires both a belief by defendant and the existence of facts that will persuade a reasonable person to that belief. Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when

23

and to the extent that it appears to him that he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force.

"Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief. When use of force is permitted as self-defense, there is no requirement to believe this presumption may be overcome if you are persuaded by a reasonable doubt that the person did not reasonably believe that use of force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to himself.

. . . .

"Instruction No. 10, a person who initially provokes the use of force against himself is not a person permitted to use force to defend himself unless the person reasonably believes that he is in present danger of death or great bodily harm and he has used every reasonable means to escape such danger other than the use of physical force which is likely to cause death or great bodily harm to another person or the person has in good faith withdrawn from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and stop the use of force but the other person continues or resumes the use of force."

During the State's rebuttal closing argument, the prosecutor argued that James would not have fled to Oklahoma if the shooting were justified.

"I submit to you a justified man who is killing because he's so scared does not run down the road to Oklahoma in a stolen vehicle. A justified man who has a right to that self-defense to protect himself or the ones he loves from someone else does not pitch his weapon out at 47th and Pawnee as he says he did. Those are not the actions of a justified man acting in defense of himself."

The jury found James guilty of first-degree murder and criminal possession of a weapon.

Judge Ternes sentenced James to a Hard 50 life sentence for first-degree murder and a concurrent 21-month sentence for criminal possession.

REFUSAL TO INSTRUCT ON RECKLESSNESS BASED HOMICIDES

James argues that Judge Ternes' refusal to instruct the jury on reckless second-degree murder and reckless involuntary manslaughter constitutes reversible error.

An appellate court performs a four-step review of challenges to jury instructions:

"'"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012).' [Citation omitted.]

"'"Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. [Citation omitted.] And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. [Citations omitted.]'

"'"We examine 'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law

25

or whether it is reasonable to conclude that they could have misled the jury.' [Citation omitted.]" [*State v.*] *Hilt*, 299 Kan. [176] at 184-85 [322 P.3d 367 (2014)].' *State v. Mattox*, 305 Kan. 1015, 1020, 390 P.3d 514 (2017)." *State v. Pulliam*, 308 Kan. 1354, 1361-62, 430 P.3d 39 (2018).

James requested both instructions and objected to their exclusion. This challenge is therefore properly preserved.

We next examine whether the requested instructions were legally appropriate.

"An instruction on a lesser included crime is legally appropriate. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). And a lesser included crime includes a 'lesser degree of the same crime.' K.S.A. 2017 Supp. 21-5109(b)(1). This court has recognized five degrees of homicide. In descending magnitude, they are capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. *State v. Carter*, 305 Kan. 139, 161, 380 P.3d 189 (2016) (citing *State v. Cheever*, 295 Kan. 229, 258-59, 284 P.3d 1007 [2012])." *Pulliam*, 308 Kan. at 1362.

Second-degree murder and involuntary manslaughter are both lesser degrees of first-degree murder and would have been legally appropriate instructions.

Judge Ternes' rejection of the requested instructions turned on the element framing the third step of our appellate analysis, whether the instructions were factually appropriate. His interpretation of the admitted evidence was that, even under James' self-defense version, James acted intentionally, because he feared the men surrounding him.

Both crimes at issue involve "reckless" behavior, but their degrees of recklessness differ. Reckless second-degree murder requires the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2018 Supp. 21-5403(a)(2).

26

Reckless involuntary manslaughter requires only the killing of a human being committed "[r]ecklessly." K.S.A. 2018 Supp. 21-5405(a)(1). A "person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2018 Supp. 21-5202(j); see also *State v. Gonzalez*, 307 Kan. 575, 581, 412 P.3d 968 (2018) (outlining requirements of unintentional second-degree murder, reckless involuntary manslaughter).

We have previously addressed the differences between the intentional and reckless forms of second-degree murder in *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012). In that case, we noted "blind conduct, while one form of reckless conduct, is not the only type of conduct that can be reckless; even an intentional blow can result in an unintentional but reckless killing." 293 Kan. at 882. "[I]t is not the intent to inflict a blow but the intent to kill that is the focal point" of the distinction between intentional second-degree murder and unintentional but reckless second-degree murder. 293 Kan. at 882. "[T]he unambiguous language of [the second-degree murder] statute requires the killing—*the result*—to be either intentional or unintentional." (Emphasis added.) 293 Kan. at 883 (citing substantively identical predecessor statute). In short, evidence that James intended the underlying act of shooting is inadequate to rule out an instruction on reckless second-degree murder. The question is whether there was evidence that a killing was committed recklessly.

Although we decided *Deal* on law that predated the legislature's 2011 criminal code recodification, the recodified statute on culpable mental states is consistent with its holding. A person's conduct is intentional with respect to a result "when it is such person's conscious objective or desire to . . . cause the result." K.S.A. 2018 Supp. 21-

27

5202(h). This stands in contrast to the definitions of "recklessly" and "reckless" under K.S.A. 2018 Supp. 21-5202(j).

Looking at the evidence in this case in a light most favorable to James, as this court must, we conclude that a jury instruction on reckless second-degree murder was factually appropriate. There was testimony and physical evidence that James did not intend to kill McClennon. The first shot fired by James went into the air and hit the ceiling. James testified that he was not firing at anyone when he shot the second time. This testimony echoed what he had told Kindred when he learned McClennon was dead. Although James' version was disputed, there was enough that a reasonable juror could have convicted James of killing McClennon recklessly while manifesting extreme indifference to the value of human life. The State's responsive assertion that there is no testimony that James fired "blindly" or fired only "warning shots" requires too much to justify an instruction for reckless second-degree murder. The instruction was factually appropriate, and the district judge's refusal to give the instruction was error.

It does not follow automatically that facts supporting a reckless second-degree murder instruction also support a reckless involuntary manslaughter instruction because of the difference in degree of recklessness between the crimes mentioned above. We thus must examine the evidence supporting reckless involuntary manslaughter.

Recently, in *State v. Gonzalez*, 307 Kan. 575, 412 P.3d 968 (2018), this court rebuffed a constitutional vagueness challenge to the greater crime, differentiating its recklessness requirements from that of involuntary manslaughter along the way.

> "'To convict a defendant charged with unintentional second-degree murder, the State is required to prove not only that the defendant consciously disregarded a substantial and unjustifiable risk that death will result from existing circumstances but also that the

28

defendant did so under "circumstances manifesting extreme indifference to the value of human life." [Citation omitted.] Although recklessness is an essential element to prove the offense in both statutes, the unintentional second-degree murder statute still requires an additional element.'" *Gonzalez*, 307 Kan. at 583.

The "difference between unintentional second-degree murder and involuntary manslaughter is one of degree and not one of kind." 307 Kan. at 583. There is a "recognized spectrum of culpability for the results of one's reckless acts." 307 Kan. at 583. Recklessness attributable to "'purpose or knowledge is treated as depraved heart second-degree murder, and less extreme recklessness is punished as manslaughter.'" 307 Kan. at 583 (quoting *State v. Robinson*, 261 Kan. 865, 877-78, 934 P.2d 38 [1997]). In *Gonzalez*, the "instructions required the jury to place [the defendant's] conduct on that spectrum by deciding whether the facts showed he was not just reckless in disregarding the risk that [the victim] would die, but also extremely indifferent to the value of human life." *Gonzalez*, 307 Kan. at 583.

This being said, on the particular evidentiary record before us today, an instruction on reckless involuntary manslaughter also was factually appropriate. If jurors accepted that James acted recklessly, the evidence did not foreclose culpability at either end of the spectrum for the results of his reckless acts. The varying accounts of what happened inside the basement—and outside view of any surveillance cameras—presented the jury with a range of possibilities. It was the jury's task, not the district judge's, to consider the evidence and assess factors—such as the number of people in the basement and James' reasons for shooting—before reaching a conclusion on whether James' recklessness rose to the second-degree murder level of extreme indifference to the value of human life. The district judge also erred in refusing to give the reckless involuntary manslaughter instruction.

29

We now turn to harmlessness. James argues that each of the errors identified is a constitutional flaw in his trial. See *State v. Salary*, 301 Kan. 586, 599, 343 P.3d 1165 (2015). He urges us to reconsider our caselaw applying a statutory harmlessness test to such instruction error. He argues that these errors implicate federal and state constitutional guarantees of a defendant's right to present his or her theory of defense. See *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003) (defendant entitled to present theory of his or her defense; exclusion of evidence integral to theory violates defendant's fundamental right to fair trial).

James does not cite any caselaw or other authority establishing the rule he seeks, and he does not otherwise articulate an argument sufficient to persuade a majority of this court to reconsider application of the statutory test in these circumstances. See *State v. Torres*, 280 Kan. 309, 331, 121 P.3d 429 (2005) (simply pressing point without pertinent authority, without showing why point sound despite lack of supporting authority or in face of contrary authority akin to failing to brief issue; when party fails to brief issue, issue considered waived, abandoned). We therefore continue to apply the statutory test today.

Under that test we "must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). The burden of demonstrating harmlessness is on the party benefiting from the error, which, in this case, is the State. See *State v. Preston*, 294 Kan. 27, Syl. ¶ 3, 272 P.3d 1275 (2012).

To reach a verdict in this case the jury had to resolve the conflict between two competing versions of the critical moments surrounding the shooting of McClennon. Either James returned to the party intending to do harm to Johnson and McClennon or he returned for other reasons and then was forced to react to a lethal threat from Johnson,

30

McClennon, and Travis. The jury found James guilty of first-degree murder, which required jurors to conclude not only that the killing was intentional but also premeditated. See K.S.A. 2018 Supp. 21-5402(a)(1). This verdict eliminates the possibility that the jury viewed the killing as merely reckless, and we can safely say there is no reasonable probability the judge's refusal to instruct on either or both reckless second-degree murder and involuntary manslaughter affected the outcome of the trial.

REFUSAL TO INSTRUCT ON IMPERFECT SELF-DEFENSE INVOLUNTARY MANSLAUGHTER

James' second appellate challenge mirrors his first. He argues that the jury should have been instructed on imperfect self-defense involuntary manslaughter. Our analysis of this issue uses the same analytical framework and standard of review outlined for his first issue.

Imperfect self-defense based on a "lawful act [committed] in an unlawful manner" has been characterized as a "lawful exercise of self-defense, but with excessive force," *State v. McCullough*, 293 Kan. 970, 976, 270 P.3d 1142 (2012), and was first recognized in *State v. Gregory*, 218 Kan. 180, 185-86, 542 P.2d 1051 (1975).

James preserved this issue by requesting the instruction and objecting to its omission.

The instruction was legally appropriate, because involuntary manslaughter is a lesser degree of homicide and therefore a lesser included crime of first-degree murder.

The State argues in its brief that the instruction was not factually appropriate because the crime requires the defendant's act to be unintentional. It cites relatively recent opinions from the Court of Appeals interpreting the current version of involuntary

manslaughter, as well as older opinions from this court that interpreted the pre-recodification statute. Although these authorities were good law when the State's brief was filed, this court has since held that there is no requirement that "lawful act in an unlawful manner" involuntary manslaughter be committed unintentionally. *Pulliam*, 308 Kan. 1354, Syl. ¶ 1 ("Conviction of involuntary manslaughter under an imperfect self-defense theory pursuant to K.S.A. 2017 Supp. 21-5405(a)(4) does not require proof of a reckless or unintentional killing.").

The State's alternative argument is that the evidence demonstrated James was an initial aggressor who cannot rely on either perfect or imperfect self-defense. See K.S.A. 2018 Supp. 21-5226. According to the State, "overwhelming evidence showed that defendant retrieved his gun, returned to the party, followed Johnson and the victim down the stairs, and fired the fatal shot 37 seconds after entering the basement."

Although the State's version of the facts is certainly plausible, even arguably probable, it was not the only version offered at trial. James testified that he had his gun on his hip the entire night. Both he and Hughes testified that they came back to the party because she had promised to help clean up. It is undisputed—and corroborated by surveillance video—that James followed Johnson and McClennon back into the party. But what happened during the next 37 seconds is not so clear. One version of events has James surrounded by three menacing men, two of them ready to fight and the third possibly armed with a gun. The question of whether James was the initial aggressor was a fact question for the jury to decide and the answer not so obvious that the applicability of imperfect self-defense was precluded.

The question remains whether an imperfect self-defense involuntary manslaughter instruction was otherwise supported by the evidence admitted at trial and thus factually appropriate.

32

Based on the trial evidence viewed in the light most favorable to James, we hold that it was. One of the key points of contention at trial was whether any of the three men James described as surrounding him had a gun. The State's position was that no one other than James had such a weapon. If the jury agreed with the State on that point, it is nevertheless possible the jury could have concluded, based on James' testimony and the testimony of others, that James was warranted in exercising some level of self-defense but exceeded necessary force by firing his gun. He would have committed a lawful act in an unlawful manner.

It was error for the judge not to instruct the jury on imperfect self-defense involuntary manslaughter.

Under the statutory harmless error standard, again, we "must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." *Ward*, 292 Kan. at 565. On the facts of this case, we conclude there was no reasonable probability this instruction error affected the outcome.

Despite the theoretical possibility that the jury could have reached an involuntary manslaughter verdict based on imperfect self-defense, such a verdict was highly improbable. According to Gorrill's expert testimony and other witnesses, the second shot that killed McClennon appears to have hit him as he was running away from James after the first shot. Shooting an unarmed person in retreat is antithetical to self-defense, perfect or imperfect.

SIMULTANEOUS JURY CONSIDERATION OF LESSER INCLUDED CRIMES

James argues that the jury should have been instructed to consider verdicts of premeditated murder and imperfect self-defense voluntary manslaughter simultaneously.

James concedes that he did not request the instruction and thus this court should review the issue for clear error. The State also argues that the invited-error doctrine should preclude review by this court because James requested the instruction he now challenges. In reply, James clarifies that he is not challenging Instructions 5 and 6, which told the jury that "if you do not agree that the defendant is guilty of" the greater crime, "you should then consider the lesser included offense." Rather, he is challenging the judge's failure to affirmatively instruct the jury to consider premeditated first-degree murder and imperfect self-defense voluntary manslaughter simultaneously.

Regardless of the merit of any preservation argument, James cannot prevail on this issue. A majority of this court has held mere months ago that a "district court is not required to instruct a jury to consider a lesser included homicide offense simultaneously with any greater homicide offense." *State v. Sims*, 308 Kan. 1488, Syl. ¶ 2, 431 P.3d 288 (2018), *pet. for cert. filed* April 29, 2019. Regardless of any disagreements a minority of the court might have had with that ruling, see 308 Kan. at 1507-09 (Beier, J., concurring) ("sequential consideration does not ensure that a jury ever reaches, much less effectively considers, [defense] theory"), *Sims* is now the controlling precedent.

The district judge did not err by failing to instruct the jury to consider lesser included crimes simultaneously.

ADMISSION OF AUTOPSY PHOTOS

James next challenges Judge Ternes' admission of autopsy photos over repeated defense objections.

"'"The standard of review for the admission of photographic evidence requires the appellate court to first determine whether the

34

photos are relevant. If a party argued that the photographs are overly repetitious, gruesome, or inflammatory, that is to say, prejudicial, the standard of review is abuse of discretion.'" *State v. Rodriguez,* 295 Kan. 1146, 1156, 289 P.3d 85 (2012) (quoting *State v. Riojas,* 288 Kan. 379, 387, 204 P.3d 578 [2009]). Abuse of discretion also is the standard of review when a party challenges evidence as cumulative.' *State v. Hilt*, 299 Kan. 176, 195, 322 P.3d 367 (2014).

"The burden of demonstrating abuse of discretion falls on the party asserting the error. See *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012). A district court abuses its discretion when the challenged action

"""(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.'"' 295 Kan. at 1156 (quoting *State v. Robinson*, 293 Kan. 1002, 1027-28, 270 P.3d 1183 [2012])." *State v. Love*, 305 Kan. 716, 721, 387 P.3d 820 (2017).

James argues that Judge Ternes understated the gruesomeness of the photos and that there was "not a compelling reason for admission, because the State had already admitted a video showing Mr. McClennon's death in real time."

Photographic evidence is relevant if "it has a reasonable tendency to prove a material fact." *Love*, 305 Kan. at 721.

"Autopsy photographs assisting a pathologist in explaining the cause of death are relevant and admissible, but those serving only to ""inflame the minds of the members of the

35

jury"'' are not. *Rodriguez*, 295 Kan. at 1157 (quoting *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 [2009]). In addition, a district court may abuse its discretion by admitting unduly repetitious photographs. 295 Kan. at 1157. 'The admission of photographs in a murder case has rarely been held to be an abuse of discretion.' 295 Kan. at 1157 (citing *State v. Sappington*, 285 Kan. 176, 195, 169 P.3d 1107 [2007]). '"[B]ecause the State has the burden to prove every element of the crime charged, photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant even if the cause of death is not contested."' *Hilt*, 299 Kan. at 196; see *State v. Dupree*, 304 Kan. 43, 64, 371 P.3d 862 (2016) ('As to materiality, photographs showing the jury the manner of death are material in a murder trial.')." *Love*, 305 Kan. at 721-22.

The photos James challenges were not repetitious. They allowed the pathologist to explain the path of the bullet that killed McClennon and show skull fractures that resulted. Although the State introduced video evidence of McClennon stumbling and falling in the moment after being shot, it is impossible to tell from the video alone what caused McClennon to stumble and fall.

Judge Ternes did not abuse his discretion by admitting the photos.

PROSECUTORIAL ERROR

This court applies a two-step analysis to evaluate claims of prosecutorial error.

"To determine if the prosecutor erred, 'the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' [*State v.*] *Sherman*, 305 Kan. [88, 109, 378 P.3d 1060 (2016)]. If the court finds error, the burden falls on the State to demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no

36

reasonable possibility that the error contributed to the verdict.' *Sherman*, 305 Kan. 88, Syl. ¶ 8." *State v. Butler*, 307 Kan. 831, 863, 416 P.3d 116 (2018).

During the State's closing, the prosecutor said, "I submit to you a justified man who is killing because he's so scared does not run down the road to Oklahoma in a stolen vehicle."

James argues there was no evidence to support the prosecutor's description of Hughes' car as "stolen." The State attempts to excuse the comment as being a reasonable inference based on the evidence. According to the State, "While defendant is correct in noting that Hughes did not expressly testify that defendant stole her car, Hughes's testimony, as well as that of defendant, indicated that defendant did not seek or obtain Hughes's permission to take the vehicle."

There are two basic elements of theft: unauthorized control over the property and an intent to deprive the owner of the property. See K.S.A. 2018 Supp. 21-5801 (theft, permanent deprivation); K.S.A. 2018 Supp. 21-5803 (criminal deprivation, temporary). Given the dating relationship of Hughes and James, it was at least presumptuous of the prosecutor to state, in essence, that James lacked implicit or explicit permission to use Hughes' car as if it were his own. Even assuming lack of authorization was established, there was no evidence that James intended to permanently or temporarily deprive Hughes of the car. The prosecutor's description of the car as "stolen" was error because it was unsupported by evidence.

Moreover, as noted in James' brief, referencing an uncharged crime can be problematic because it encourages jurors to draw an inference of a defendant's propensity to commit crimes. Under K.S.A. 2018 Supp. 60-455(a), evidence of other crimes or civil wrongs is generally inadmissible. Even if James' exit in Hughes' car might fall outside the

37

prohibition in K.S.A. 2018 Supp. 60-455(a) because it occurred on the same "specified occasion" as the murder, it qualified as unnecessary and unwise as well as factually unsupported.

To avoid reversal of James' convictions for the prosecutor's error, the State must establish "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Sherman*, 305 Kan. 88, Syl. ¶ 8, 378 P.3d 1060 (2016).

In light of the entire record, the error does not require reversal. The remark was isolated. The point the prosecutor sought to make—that a person "justified" in shooting would not flee the state—was a valid argument, regardless of whether the car was stolen. Moreover, the jury heard testimony that Hughes and James were in a dating relationship and that James had driven the car to Parrot-fa-Nalia. In other words, the prosecutor's characterization probably did more to damage her credibility than it did to undermine the defense case. There was no dispute James simply left the scene in the same car he had driven to it.

CONSTITUTIONAL RIGHT TO PRESENCE

"An appellate argument on a 'defendant's right to be present at every critical stage of his or her criminal trial raise[s] an issue of law over which this court exercises unlimited review.' *State v. Verser*, 299 Kan. 776, 787, 326 P.3d 1046 (2014)." *State v. Wright*, 305 Kan. 1176, 1178, 390 P.3d 899 (2017) (*Wright I*).

Sylvester asked for, and received, trial continuances on two occasions. The requests were made using the same generic form, and each contained a representation

from Sylvester that he had "consulted with" James and acknowledged that the continuance would be charged to the defendant. The State does not dispute that James was not present when either continuance was granted.

This court has held that a continuance hearing is a critical stage at which a defendant is entitled to be present. See *Wright I*, 305 Kan. at 1178.

> "'Under the plain language of [the speedy trial statute,] K.S.A. 22-3402, a continuance resulting from a defendant's request stays the running of the statutory speedy trial period. When the request is made by defense counsel, the request for continuance is attributable to the defendant unless the defendant timely voices an objection. Because a defendant's disagreement matters in a statutory speedy trial analysis, a defendant must have an opportunity to be present to express that disagreement.' *State v. Dupree*, 304 Kan. 43, Syl. ¶ 2, 371 P.3d 862 (2016)." *Wright I*, 305 Kan. at 1178.

Thus James' right to be present at every critical stage was violated when continuances were ordered outside his presence, unless he knowingly and voluntarily waived that right. See *State v. Northern*, 304 Kan. 860, 862, 375 P.3d 363 (2016). Because we see nothing in the record to evidence such a waiver, we assume error on this point.

Assuming James' right was violated, the error may be declared harmless under the constitutional standard "'where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Wright I*, 305 Kan. at 1179 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

In *Wright I*, this court remanded the case to the district court for factual findings to enable evaluation of the harmlessness of the deprivation of a defendant's right to be present at a continuance hearing.

"Unfortunately, our ability to examine harmlessness here is stymied by the lack of factual findings on the presence issue from the district court. See *State v. Hoge*, 283 Kan. 219, 221-22, 150 P.3d 905 (2007) (meaningful appellate review precluded when trial court's findings of fact, conclusions of law inadequate to disclose controlling facts, basis for court's findings); see also *State v. Moncla*, 269 Kan. 61, 65, 4 P.3d 618 (2000) (district judge must make factual findings before appellate review can occur). Without more information about the parties' circumstances and the avenues available to them and the judge on August 19, we cannot determine with any level of confidence whether Wright's absence was prejudicial. We are unable to assume that he would have changed the judge's mind about granting the continuance, making his trial timely commenced; we are unable to assume that the State would have obtained the continuance in spite of Wright's objection; we are unable to make any reliable prediction of the strength of the State's case or the strength of Wright's defense depending on the day the trial began. See *Verser*, 299 Kan. at 789-90 (strength of prosecution's case one of the factors in harmlessness analysis after violation of defendant's right to be present at all critical stages of trial).

"Ordinarily we would be inclined to lay the impotence of the record on appeal on this issue solely at the feet of the State, which must demonstrate harmlessness once an error is shown. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (State, as party benefitting from error, bears burden of showing harmlessness). We do not do so automatically here, because defense counsel and the district judge also share some responsibility for the absence of findings in the record. Defense counsel put no emphasis on this issue at the hearing on the motion for new trial and did not object to the lack of findings. See *State v. Rodriguez*, 302 Kan. 85, 91, 350 P.3d 1083 (2015) (party must object to inadequate findings of fact to preserve issue for appeal). And the judge did not ensure that all necessary findings were made on each outstanding issue, which is inconsistent with the judge's duty under Rule 165 (2017 Kan. S. Ct. R. 214).

"The one person who certainly shares none of the responsibility for letting this issue drop is Wright himself. He asserted his right to be present in the letter to Frieden, copied to the clerk of the court, who placed the letter in the court file. Wright filed the pro se motion to dismiss for violation of his right to speedy trial and, as part of it, again drew the court's attention to the violation of his right to be present. He repeatedly voiced his disapproval of the continuance Frieden obtained in his absence. This chain of events is reminiscent of those in *State v. Raskie*, 293 Kan. 906, 925-26, 269 P.3d 1268 (2012), and *State v. Seward*, 289 Kan. 715, 217 P.3d 443 (2009), in which defendants took steps to raise constitutional issues before district judges, but the judges' findings were inadequate for purposes of appellate review.

"'When an appellate court is presented with inadequate findings, the proper course taken depends on whether the issue was raised and can be resolved without remand.' *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014) (citing *Raskie*, 293 Kan. at 925-26 [remanding because district judge made inadequate findings on defendant's cruel and unusual punishment argument]). We are left with no choice but remand for findings here, because we cannot decide from the record before us whether Wright's absence on August 19 had serious or minimal consequences." *Wright I*, 305 Kan. at 1179-80.

Citing *Wright I*, James asks for a remand for the district judge to make the factual findings necessary for meaningful appellate review of his claim. We are unwilling to take this step.

This case differs from *Wright* because the record is not silent on James' contemporaneous attitude toward the continuances obtained by Sylvester. Although generic forms were used, and there is no evidence of a waiver of James' right to be present, Sylvester represented to the court that he had consulted with his client and at least implied that James agreed with his counsel's course of action.

41

In addition, the record establishes that James later acquiesced in other continuances that postponed his trial. On April 22, 2016, James agreed to his trial being moved from June to July to accommodate the court's calendar. At the same hearing, he told the court, "I'm not worried about the time." In September 2016, after Mank had finally been appointed, James again agreed to a continuance from September to November. James personally signed off on the form requesting the continuance. Unlike the defendant in *Wright*, James' initial unequivocal demand for no continuances charged against him collapsed in the face of other exigencies, principally the need for adequate time to prepare for new counsel.

Absent any consistent assertion of a violation of his speedy trial right or another sign of prejudice arising from James' absence from continuance hearings, any assumed error would not be reversible. Cf. *State v. Wright*, 307 Kan. 449, 456-58, 410 P.3d 893 (2018) (*Wright II*).

CUMULATIVE ERROR

We have identified multiple errors in James' trial, and he asserts entitlement to reversal of his convictions under the cumulative error doctrine.

> "'Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming.'" *State v. Carter*, 305 Kan. 139, 166, 380 P.3d 189 (2016).

The errors in this case consist of three instructional errors—refusal to instruct on reckless second-degree murder, reckless involuntary manslaughter, and imperfect self-defense involuntary manslaughter—and one prosecutorial error. In addition, we have

assumed a violation of James' right to be present at all critical stages because the record contains no evidence that he knowingly and voluntarily waived that right.

The prosecutor's error during closing was a discrete error that in no way compounded the instructional errors. See *Sims*, 308 Kan. at 1507 ("Taken together, these errors in no way compounded one another; they were discrete."). Likewise, the assumed violation of James' right to be present at continuance hearings did not compromise his case in any way related to the other errors. The instructional errors, however, were interwoven, and all related to James' degree of culpability in the shooting.

Despite this commonality, we nevertheless conclude that the combination of instruction errors did not deprive James of a fair trial. Again, there were two unequivocally competing versions of the critical moments on the night McClennon was killed. Statements of critical witnesses for both sides had inconsistencies. Yet only one of the versions of events had James as the aggressor. The jury must have accepted that version when it convicted him of first-degree premeditated murder, rejecting self-defense generally and passing up the opportunity to convict him of voluntary manslaughter on a theory of imperfect self-defense. Cumulative error does not require reversal of James' convictions.

CONCLUSION

We affirm the judgment of the district court.

43